UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 6:22-CR-41-CHB-HAI-2 |
| | ) | |
| v. | ) | |
| | ) | RECOMMENDED DISPOSITION |
| JEREMY D. ELLIOTTE, | ) | |
| | ) | |
| Defendant. | ) | |

\*\*\*  \*\*\*  \*\*\*  \*\*\*

The Court herein recommends a finding that Defendant Jeremy D. Elliotte's statements (made during an internal Kentucky State Police investigation into the incident that led to this prosecution) are subject to *Garrity* immunity. This recommendation is lengthy for several reasons. The factual record is dense and nuanced. The legal analysis is rarely encountered[1] and somewhat difficult to apply. The Supreme Court articulated the guiding principles in *Garrity v. State of N.J.*, 385 U.S. 493 (1967), but lower courts have diverged dramatically in applying those principles. The Sixth Circuit, in *McKinley v. City of Mansfield*, 404 F.3d 418, 436 (6th Cir. 2005), set forth the standard this Court must follow in applying *Garrity*. But later Sixth Circuit caselaw ignores that standard, leaving its contours seemingly malleable. Novelty, complexity, and nuance require an exhaustive analysis to enable meaningful pre-trial review by Judge Boom.

---

[1] One District Court found the *Garrity* line of cases to be "less-well-known," and noted:

> Writing in dissent in 2007, Judge Alex Kozinski, then Chief Judge of the Ninth Circuit, observed that he "had no idea, even though [he had] been a government employee involved in law-related activities for almost three decades," about the *Garrity* rule and its progeny. *Aguilera v. Baca,* 510 F.3d 1161, 1179 (9th Cir. 2007) (Kozinski, C.J., dissenting).

*United States v. Goodpaster*, 65 F. Supp. 3d 1016, 1024 n.7 (D. Or. 2014).

## I.  Background

Defendant was added to this case via Superseding Indictment on August 17, 2022.  D.E. 13.  Count One alleges a criminal civil-rights violation under 18 U.S.C. § 242 (with aiding and abetting under § 2).  According to Count One, Defendant and codefendant Derek Lovett used unreasonable force in assaulting an arrestee, Bradley Hamblin,[2] resulting in bodily injury.  *Id*. at 1.  Count Two names only Defendant and alleges another civil-rights violation, that he "unlawfully entered the home in which S.B., D.C., and C.C. were residing without a warrant and without other legal justification."  *Id*. at 2.

Count Three alleges that Defendant, Lovett, and another codefendant named Michael Howell conspired against the United States (under 18 U.S.C. § 371) "by knowingly engaging in misleading conduct toward another person with the intent to hinder, delay, and prevent the communication of information to a federal law enforcement officer and judge relating to the commission and possible commission of a federal offense."  D.E. 13 at 2.  This is alleged to be obstruction of justice in violation of 18 U.S.C. § 1512(b)(3).  *Id*.  The Superseding Indictment alleges that Defendants conspired to conceal "the true nature of the force used against [Hamblin] and the true nature of the circumstances under which they had used force" against him.  *Id*. at 3.  The Superseding Indictment alleges that these Defendants agreed to a false version of events.  Then, two days after the alleged assault, on August 20, 2020, Defendant

> gave an interview to a KSP supervisor who was investigating the use of force as part of a KSP Response to Resistance ("RR") interview.  During that interview, ELLIOTTE stuck to the agreed-upon cover story and knowingly misled his supervisor, including by falsely claiming that [Hamblin]: 1) attempted to flee three times prior to the use of force described in Count 1; 2) "aggressively resisted arrest," and; 3) simultaneously flailed his arms and buried his arms underneath him prior to ELLIOTTE and LOVETT using force on him.

---

[2] The victim is identified as B.H. in the Superseding Indictment, but he was identified in open court and he has a related civil-rights lawsuit pending, *Hamblin v. Elliotte, et al.*, 6:20-CV-245-KKC-HAI.

*Id.* at 3-4.  The "KSP supervisor" mentioned here was Jason Partin, who later testified at the evidentiary hearing in this matter.

Count Four is another obstruction-of-justice count under § 1512(b)(3).  While Count Three is targeted at the alleged August 18 formation of the conspiracy, Count Four is based directly on Defendant's conduct at the August 20, 2020 RR Interview, described above.  D.E. 13 at 4-5.  Defendant appeared by summons and is currently released on pretrial bond.  *See* D.E. 30, 38.

On January 13, 2023, Defendant filed a "MOTION TO SUPPRESS EVIDENCE SUBJECT TO GARRITY v. NEW JERSEY."  D.E. 55.  He argues that, under binding case law, his statements during the RR interview were coerced and therefore inadmissible against him in a criminal prosecution.  The motion is accompanied by various exhibits, including an affidavit from Defendant and an affidavit from a former KSP Lieutenant, Clyde Anthony "Tony" Dingess.  *See* D.E. 55, 58 (redacted versions of certain exhibits).  On January 27, the government responded in opposition to the motion, and filed additional exhibits.  D.E. 59.  On February 6, Defendant replied, with further exhibits.  D.E. 61.  Defendant also filed grand jury transcripts.  D.E. 66.  After conducting a teleconference (D.E. 71), the Court set an evidentiary hearing (D.E. 72).

The evidentiary hearing took place in London on March 15 and March 30, 2023.  D.E. 77, 80.  Transcripts are filed in the record.  D.E. 83, 84.  The defense called as witnesses certain KSP officials—Jason Partin, Shawna Kincer, and Tony Dingess.  Defendant also testified.  And the government called James Henry "Trey" Green from KSP internal affairs.  D.E. 82.  Multiple

exhibits were also admitted at the hearing.  *Id*.  The parties filed post-hearing briefs.  D.E. 85, 86, 87.

## II.  Legal Standards

The *Garrity* immunity rule in a nutshell is this:  If a state employee is compelled to give truthful answers in an internal agency investigation, then those statements are inadmissible in a later criminal proceeding concerning the conduct being investigated.  The *Garrity* immunity rule derives from *Garrity v. New Jersey*, 385 U.S. 493 (1967).  In that case, police officers suspected of ticket fixing were summoned to answer questions under oath in an internal investigation.  They were told of their right to remain silent.  But the investigator also gave a warning:

> This right or privilege which you have is somewhat limited to the extent that you as a police officer under the laws of our state, **may be subjected to a proceeding to have you removed from office if you refuse to answer a question** put to you under oath pertaining to your office or your function within that office.  It doesn't mean, however, you can't exercise the right.  You do have the right.

*Id*. at 505 n.1 (Harlan, J., dissenting) (emphasis added).

Although the warning indicated the officers under investigation "may then be subject to a proceeding to have you removed," the applicable New Jersey statute (since repealed) said that a state employee "who refuses to testify upon matters relating to the office . . . upon the ground that his answer may tend to incriminate him or compel him to be a witness against himself . . . **shall**, if holding [public office], be removed therefrom or shall thereby forfeit his office" along with any future tenure or pension.  And the person "**shall** not thereafter be eligible for election or appointment to any public office, position or employment in this State."  *Garrity*, 385 U.S. at 494 n.1 (emphasis added).  The language in the statute was thus mandatory.

The *Garrity* Court concluded, "We now hold the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal

proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic." *Garrity*, 385 U.S. at 500. As a leading Criminal Procedure treatise states,

> The Court did not describe the internal investigation as granting immunity, but subsequent lower court rulings have uniformly viewed a public employer's threat to impose sanctions unless an employee answered potentially incriminating questions concern the employment as the equivalent of an immunity order, and the statements made in response to that threat have been described as cloaked with "*Garrity* immunity." . . . "*Garrity* immunity" commonly is viewed as providing use/derivative-use immunity equivalent in scope to the immunity described in [*Kastigar v. United States*, 406 U.S. 441 (1972)]. . . . *Garrity* constitutes an exception to the usual rule requiring the individual to assert the privilege at the point of interrogation, as opposed to answering and then advancing a self-incrimination objection when the government seeks to use that response in a criminal prosecution.

LaFave, *et al*., 3 Criminal Procedure § 8.11(f) Garrity immunity (4th ed.).

## A.

In the decades following *Garrity*, different circuits (and state courts) came to differing conclusions about when this immunity is triggered. Courts have diverged into two streams in applying *Garrity*. The stricter stream is exemplified by the oft-cited case of *United States v. Indorato*, 628 F.2d 711 (1st Cir. 1980), in which a defendant's statement was found not coerced. Under existing police department regulations, the *Indorato* defendant could have faced proceedings for failure to answer questions, and those proceedings could have resulted in "dismissal or other disciplinary action." But the Court found the case was not "within the ambit" of *Garrity* because the police department rules did not suggest "that dismissal would [] have automatically followed [the] defendant's invocation of the fifth amendment." *Indorato*, 628 F.2d at 715-16. The *Indorato* approach only applies *Garrity* immunity when "(1) the person being investigated is explicitly told that failure to waive his constitutional right against self-

incrimination will result in his discharge from public employment . . . and (2) there is a statute or municipal ordinance mandating such procedure." *Id*. at 716.

However, a different line of cases, which includes *McKinley v. City of Mansfield*, 404 F.3d 418 (6th Cir. 2005), and the cases utilized by the *McKinley* Court takes a less stringent approach.  For two cases discussing these diverging streams, *see People v. Haleas*, 937 N.E.2d 327, 332-33 (2010); *State v. Aiken*, 636 S.E.2d 156, 158 (2006), *aff'd*, 282 Ga. 132, 646 S.E.2d 222 (2007).  Naturally, in this matter, the government tends to cite authorities from the *Indorato* line of cases, and the defense tends to rely on cases from the other stream, particularly *McKinley*. Because *McKinley* is a thoroughly reasoned published Sixth Circuit opinion, this Court is bound by the standards it articulates, and will draw from cases that apply similar standards.  Further, as one court has pointed out, *Indorato* may no longer be good law after the Supreme Court's decision in *Minnesota v. Murphy*, 465 U.S. 420 (1984).  *United States v. Goodpaster*, 65 F. Supp. 3d 1016, 1031 (D. Or. 2014).  The district court in *Goodpaster* rejected the *Indorato* Court's requirement that *Garrity* only applies when "(1) the person being investigated is explicitly told that failure to waive his constitutional right against self-incrimination will result in his discharge from public employment . . .; and (2) there is a statute or municipal ordinance mandating such procedure." *Id*.  The *Goodpaster* court noted that, in *Murphy*, (1) the existence of an explicit threat was only a factor to be considered in the objective analysis and (2) rather than requiring a statute-mandated penalty, "*Murphy* inquired merely whether 'the State, either expressly or by implication, assert[ed] that invocation of the privilege would lead to [a penalty].'" *Id*. (quoting *Murphy*, 465 U.S. at 437-38).  If so, the compelled answers would be inadmissible. *Id*.

The bottom line is that the pivotal question, as posed by the Sixth Circuit in *McKinley*, is whether the Defendant/interviewee "**reasonably believed that substantial penalties were likely to result from his refusal to answer questions.**" *McKinley v. City of Mansfield*, 404 F.3d 418, 436 n.20 (6th Cir. 2005). *McKinley* is the leading published case from the Sixth Circuit on this subject. *McKinley* is binding and thoroughly reasoned (although convoluted in its factual background). This Court is bound to apply its standard.

Several important principles have developed under the strand of case law this Court will apply:

(1)     The threatened sanction need not be explicitly the loss of one's job; it can be some other "substantial" job-related penalty.

(2)     The threatened sanction need not be explicitly communicated to the interviewee by the interviewer.   In fact, the threatened sanction can be "implied" under existing statutes, policies, and procedures known to the interviewee.

(3)     The threatened sanction need not be automatic, immediate, or mandatory.

(4)     The relevant statute, policy, or procedure need not explicitly target the invocation of the right to remain silent—it is enough that the rule requires full cooperation with the investigation.

(5)     For a statement to be compelled under *Garrity*, it is not necessary that the interviewee subjectively experience the same pressure as the officers in *Garrity*. In other words, the interviewee does not have to prove she felt she had to make a terrible choice between losing her job on one hand and opening herself to potential criminal prosecution on the other hand.   This is because the point of *Garrity* immunity is to dissolve this dilemma.

7

(6)     *Garrity* immunity does not apply to "standard" or "routine" reporting required by one's job duties.

The Court will now elaborate upon the six principles identified above.

**B.**

First, under the case law this Court will apply, the threatened sanction need not be explicitly the loss of one's job; it can be some other "substantial" job-related sanction. The Sixth Circuit adopted this position in *McKinley*:

> [The Supreme] Court has not limited this Fifth Amendment principle to cases where the state threatens job loss; the rationale of *Garrity* applies with equal force where the state exacts answers from its contractors under threat of terminating their contracts, *see Lefkowitz v. Turley*, 414 U.S. 70, 78-81 (1973), and where a state "impose[s] substantial penalties because a witness elects to exercise his Fifth Amendment right not to give incriminating testimony against himself." *Lefkowitz v. Cunningham*, 431 U.S. 801, 805 (1977) (holding that New York could not strip a state Democratic party official of his office on the grounds that he refused to waive his Fifth Amendment privilege against self-incrimination before a grand jury).
>
> . . . . [It] makes no difference, as the Supreme Court's cases make clear, that the manner of compulsion was the threat of disciplinary action and termination of employment, rather than physical coercion. Indeed, **if McKinley reasonably believed that Defendants would impose substantial penalties on him—such as job loss or disciplinary sanctions—if he refused to answer the questions put to him in the second interview, he was compelled to incriminate himself** in violation of the Fifth Amendment. *Lefkowitz v. Cunningham*, 431 U.S. at 805-806. On the facts before us, we cannot conclude as a matter of law that McKinley's belief that he would face severe sanctions for declining to incriminate himself was unreasonable.

*McKinley v. City of Mansfield*, 404 F.3d 418, 435-36 (6th Cir. 2005) (emphasis added). In setting this standard, the *McKinley* Court cited *United States v. Friedrick,* 842 F.2d 382, 395 (D.C. Cir. 1988), and *United States v. Vangates,* 287 F.3d 1315, 1321-22 (11th Cir. 2002), but declined to require proof the defendant reasonably believed he would be *fired*:

> **It is sufficient, we think, for a jury to conclude that he reasonably believed that substantial penalties were likely to result from his refusal to answer questions** during the second interview; **although job termination is surely a "substantial penalty," so, too, are other employer actions, such as ordering a demotion or suspension**. *See Dwan v. City of Boston,* 329 F.3d 275, 279 (1st Cir. 2003) (observing that to prove his incriminating statements were compelled, an employee must show that he was "threatened or forewarned of [a] sanction for refusing to testify"). Relevant to the question whether McKinley reasonably believed he faced a threat of substantial penalties are the totality of the circumstances surrounding the second interview and the circumstances of the first interview, to the extent they are probative of McKinley's state of mind, and whether that state of mind was reasonable, during the second.

*Id.* at 436 n.20 (emphasis added).

Other courts have observed that the Sixth Circuit in *McKinley* adopted a test—reasonable belief that "substantial penalties" would result from failure to answer questions—that is broader than in other circuits, where the threat of termination is required. *Reno v. E. Baton Rouge Par. Sch. Bd.*, 697 F. Supp. 2d 659, 662 n.1 (M.D. La. 2010); *United States v. Hutley*, No. 1:10-CR-127-MHS-AJB, 2010 WL 4223741, at *10 n.3 (N.D. Ga. Aug. 27, 2010), *report and recommendation adopted*, 2010 WL 4225419 (N.D. Ga. Oct. 20, 2010); *Patterson v. E. Baton Rouge Par. Sch. Bd.*, No. CIVA09-774-JVP-SCR, 2010 WL 1252360, at *3 n.1 (M.D. La. Mar. 23, 2010); *State v. Yacchari*, 2011-Ohio-3911, ¶¶ 36-37.

As will be seen, in this case, the threatened penalties were substantial, including potential job loss, had Defendant failed to cooperate and answer Sgt. Partin's questions.

## C.

Second, the threatened sanction need not be explicitly communicated to the interviewee by the interviewer (as it was in *Garrity*). In fact, the threatened sanction can be *implied* under existing statutes, policies, and procedures known to the interviewee. This is because the lodestar in this line of cases is the subjective, but reasonable, belief of the interviewee. As the Illinois

Court of Appeals observed, the line of authority "evolving" from *Fredrick*, *Vangates*, and *McKinley* has "determined that *Garrity* immunity may apply even where the threat of termination is implied rather than explicit or overt." *People v. Haleas*, 937 N.E.2d 327, 332-33 (2010).  And even the narrower *Indorato* line of cases does not "rule[] out the possibility that implied threats could violate a defendant's *Garrity* rights."  *United States v. Trevino*, 215 F. App'x 319, 321 (5th Cir. 2007).

An example of this principle in action is the *Goodpaster* case from the District of Oregon, which applies a Ninth Circuit case's application of the Supreme Court's *Murphy* case:

> In this case, Goodpaster was subject to a regulation, 39 C.F.R. § 230.3(a), requiring that he "cooperate with all audits, reviews, and investigations conducted by the Office of Inspector General."  The same regulation provides that "failing to cooperate . . . may be grounds for disciplinary or other legal action."  He was also subject to a workplace policy that required him to "cooperate in any postal investigation, including Office of Inspector General investigations" and that provided for "appropriate disciplinary measures" should he not cooperate.  ELM §§ 665.3, 665.6.
>
> An order to "cooperate" demands more of the reasonable employee than an order merely to be "truthful."  *Cf.* [*Minnesota v. Murphy*, 465 U.S. 420, 437 (1984)] (observing that "Murphy's probation condition [to be truthful] proscribed only false statements").  At the same time, it does not *clearly* communicate that that the employee must "answer all" questions.  *Cf.* [*United States v. Saechao*, 418 F.3d 1073, 1078 (9th Cir. 2005)].  But such a clear-statement rule is foreclosed by *Saechao*, which several times stressed that threatening a penalty "*by implication*" is sufficient to create a penalty situation.  *See id.* at 1076, 1077, 1079, 1080 n. 6 (quoting *Murphy*, 465 U.S. at 435) (emphasis added in original).  As in both *Saechao* and *Bahr,* had Goodpaster remained silent, the regulation and the ELM here "would have justified" his employer (the USPS) firing him.  *Cf. id.* at 1078; [*United States v. Bahr*, 730 F.3d 963, 967 n.4 (9th Cir. 2013)].  Thus, there is a "reasonable basis for concluding that [the USPS] attempted to attach an impermissible penalty to the exercise of the privilege against self-incrimination." *Cf. Murphy*, 465 U.S. at 437. Objectively, therefore, these provisions created a penalty situation.

*United States v. Goodpaster*, 65 F. Supp. 3d 1016, 1029-30 (D. Or. 2014).

As will be seen, no one explicitly threatened Defendant with substantial penalties for failing to answer questions.  However, there existed known written policies and cultural expectations among KSP employees that led officers and supervisors to assume that a failure to respond to questions in an RR investigation would lead to substantial penalties for insubordination and obstruction, including even termination.  As will be discussed more fully below, the written policies include a policy on "Obstructing an Internal Investigation" that explicitly requires troopers to "answer and answer truthfully" (and not "knowingly fail or omit to answer fully and truthfully") a superior officer's questions related to the scope of employment and agency operations.  Another policy requires obedience to a superior officer's lawful orders.  And the witnesses testified consistently that, within the KSP's culture, a superior officer's questions carry an implied order to answer.  Both insubordination (defying a lawful order) and obstruction carry substantial penalties including job loss.

### D.

Third, the threatened sanction need not be automatic, immediate, or mandatory to trigger *Garrity* immunity.  The *McKinley* defendant was informed in his first interview "that failure to answer truthfully 'could result in disciplinary action' and 'possible job forfeiture.'"  *McKinley v. City of Mansfield*, 404 F.3d 418, 433 (6th Cir. 2005); *accord People v. Haleas*, 937 N.E.2d 327, 332-33 (2010) (observing that the threat of "possible job forfeiture" can be coercion).  To be clear, "where there is no direct threat, the **mere possibility** of future discipline is not enough to trigger *Garrity* protection."  *United States v. Smith*, 821 F.3d 1293, 1302-03 (11th Cir. 2016) (emphasis added).  Instead, again, the lodestar in this Circuit is whether the

defendant/interviewee "**reasonably believed** that substantial penalties were **likely to result** from his refusal to answer questions." *McKinley*, 404 F.3d at 436 n.20 (emphasis added).[3]

Based upon ordinary meanings, it appears the *McKinley* standard requires a defendant to prove he had a reasonable belief that a substantial penalty would *more likely than not* follow a refusal to answer questions.[4]   Under the line of cases that includes *McKinley*, the penalty therefore need not be automatic, immediate, or mandatory.

This principle can also be seen in *United States v. Goodpaster*, 65 F. Supp. 3d 1016, 1031-32 (D. Or. 2014), where the regulations provided that "failing to cooperate . . . may be grounds for disciplinary or other legal action" and "appropriate disciplinary measures" could

---

[3] In an early Sixth Circuit *Garrity* case, the Court's decision turned, at least in part, on the fact that the interviewer "testified that discipline would not necessarily have followed had Bowers refused to cooperate."  *United States v. Bowers*, 739 F.2d 1050, 1056 (6th Cir. 1984).  But subsequent case law, including *McKinley*, makes clear that "necessarily" following is not an element required for a finding of *Garrity* immunity.

    *Bowers* has limited precedential value.  The opinion only addresses *Garrity* in two paragraphs.  The first paragraph describes the *Garrity* decision.  The second paragraph distinguishes Bowers's situation from that of the *Garrity* defendants on the bases that (1) Bowers was not given an explicit warning at the beginning of the interview "that he would be disciplined if he refused to answer questions" and (2) the investigating agent "testified that discipline would not necessarily have followed had Bowers refused to cooperate."  And an earlier paragraph in *Bowers* very briefly describes the interview.  The *Bowers* Court does not articulate the precise standard it is applying.  The Court has found no cases in this Circuit that cite and rely on *Bowers*'s "necessarily have followed" language.  To the contrary, other cases discussed here in Section II establish that an explicit pre-interview warning is not necessary for *Garrity* to apply and that the discipline can be a "likely," not necessary, consequence of refusal to answer.

[4] *Black's* defines "likely" as follows:

> **likely** *adj.* (14c) **1.** Apparently true or real; probable <the likely outcome>. • In this oldest sense, the term is sometimes used ironically to express incredulity, as in the phrase *a likely story.* **2.** Showing a strong tendency; reasonably expected <likely to snow>. **3.** Well adapted for a given purpose; suitable <a likely place for settling a new community>.

LIKELY, *Black's Law Dictionary* (11th ed. 2019).  Relevant synonyms thus appear to be "probable," "showing a strong tendency," and "reasonably expected."  The word "probable," per *Black's*, means "Likely to exist, be true, or happen."  PROBABLE, *Black's Law Dictionary* (11th ed. 2019).

    *Black's* also defines "probable consequence" as "An effect or result that is more likely than not to follow its supposed cause."  CONSEQUENCE, *Black's Law Dictionary* (11th ed. 2019).  This "more likely than not" standard may be the most appropriate definition of "likely" or "probable" in this context.  *Black's* also contains a listing for "probable evidence," which is equated with "presumptive evidence," which is defined as "Evidence deemed sufficient to establish another fact unless discredited by other evidence."  EVIDENCE, *Black's Law Dictionary* (11th ed. 2019).

follow, with no specified ceiling. The court found these regulations were "sufficiently coercive" and "more than merely hypothetical." Despite the lack of specificity in the threatened penalty, the court suppressed the statements under *Garrity*. *Id*.

The government cites an unpublished Sixth Circuit case, *In re Justice*, No. 20-5479, 2021 WL 3808965, at *8-9 (6th Cir. Aug. 26, 2021), for the proposition that the penalty must be automatic for *Garrity* to apply. D.E. 86 at 19. The *Justice* Court followed the First Circuit case of *Stein*, which followed the narrower *Indorato* stream of case law. *In re Justice* does not cite *McKinley*. The *Justice* case (which is unpublished and therefore nonbinding), on this automatic-penalty point, is out of step with *McKinley* and other cases within this Circuit that follow the broader non-*Indorato* approach to *Garrity* immunity. And, in the Sixth Circuit, a prior published opinion is binding on later panels unless the prior panel is overruled by the *en banc* Court or there is an inconsistent intervening Supreme Court decision. *Brawner v. Scott Cnty., Tennessee*, 14 F.4th 585, 596 (6th Cir. 2021), *cert. denied*, 143 S. Ct. 84 (2022); *United States v. Orlando*, 281 F.3d 586, 598 (6th Cir. 2002). Further, *In re Justice* (like *Stein*) was a civil case involving attorney disciplinary proceedings, which also limits its precedential value in a criminal matter like this one.

As will be seen, in this case, the penalties feared by Defendant would not have been automatic, immediate, or mandatory. But this does not mean that *Garrity* cannot apply.

**E.**

Fourth, for *Garrity* to apply, the relevant statute, policy, or procedure need not explicitly target the invocation of the right to remain silent—it is enough that the rule requires full cooperation with an investigation (such as answering questions) under threat of substantial discipline. The statute in *Garrity* specifically levied penalties on the refusal to testify "upon the

13

ground that his answer may tend to incriminate him or compel him to be a witness against himself." *Garrity v. New Jersey*, 385 U.S. 493, 494 n.1 (1967).   But, under the precedents this Court will follow, the threat need not attach specifically to invoking the Fifth.

The Court in *McKinley* found, "The record is clear that the manner of compulsion, while not physical coercion, was nonetheless severe:  if McKinley refused to answer, he would face departmental disciplinary proceedings and termination of employment." *McKinley v. City of Mansfield*, 404 F.3d 418, 427 (6th Cir. 2005).  This was sufficient to trigger *Garrity* immunity. And, "As a matter of Fifth Amendment right, *Garrity* precludes use of public employees' compelled incriminating statements in a later prosecution for the conduct under investigation." *Id*.  "*Garrity* immunity prohibits the use of coerced statements in criminal proceedings, but it does not protect against the act of coercion itself." *Moody v. Michigan Gaming Control Bd.*, 871 F.3d 420, 429 (6th Cir. 2017).

Other courts agree.  "[W]e think it clear that . . . testimony compelled by the threat of adverse employment action *automatically* triggers a grant of immunity under *Garrity*." *Sher v. U.S. Dep't of Veterans Affs.*, 488 F.3d 489, 502 (1st Cir. 2007).  "Various . . . appellate courts— federal and state—have similarly concluded that a public employer's threat of adverse employment action operates as an automatic grant of immunity once the employee answers, meaning that the statements elicited from her are deemed 'compelled testimony' and not merely involuntary or coerced confessions." *United States v. Connolly*, No. 16-CR-0370-CM, 2019 WL 2120523, at *17 (S.D.N.Y. May 2, 2019).

Thus, there is no essential element in a *Garrity* claim requiring that the Fifth-Amendment privilege be specifically targeted in the relevant statute or policy.  What matters is compulsion to speak under threat of substantial employment consequences.  "Although the Supreme Court has

not recently revisited the *Garrity* line of cases, a number of the circuits have focused on the 'coercion' issue emphasized by the Court in those cases, making it a claim dependent on such a showing." *United States v. Cook*, 526 F. Supp. 2d 1, 6-7 (D.D.C. 2007) (quoting *United States v. Trevino*, 215 F. App'x 319, 321 (5th Cir. 2007)), *aff'd*, 330 F. App'x 1 (D.C. Cir. 2009). "[T]he touchstone of the *Garrity* inquiry is whether the defendant's statements were coerced and therefore involuntary." *Id.* Thus, a court in a *Garrity* case "must look at the surrounding circumstances, specifically focusing on whether the questioning was coercive." *Trevino*, 215 F. App'x at 321. An officer claiming *Garrity* protection "must have in fact believed his statements to be compelled on threat of [substantial penalties], and this belief must have been objectively reasonable." *Id.* A court considering this issue "must look at the surrounding circumstances, specifically focusing on whether the questioning was coercive." *Id.* at 322. In the absence of a "direct threat" of substantial penalties, a court "determine[s] whether the officer's statements were compelled by examining his belief and, more importantly, the objective circumstances surrounding it." For *Garrity* to apply, "the officer must have in fact believed the statements to be compelled on threat of [substantial penalties] and this belief must have been objectively reasonable." *United States v. Smith*, 821 F.3d 1293, 1302-03 (11th Cir. 2016) (quoting *Vangates,* 287 F.3d at 1321-22). "[F]or a statement to be suppressed under *Garrity,* the employee claiming coercion must have believed that his or her statement was compelled on threat of [substantial penalties] and this belief must have been objectively reasonable." *State v. Graham*, 991 N.E.2d 1116, 112 (Ohio 2013) (citing *State v. Brockdorf,* 717 N.W.2d 657 (Wis. 2006)).[5]

---

[5] To avoid potential confusion, the Court in these quotations replaces references to job loss with "substantial penalties" for the reasons discussed above in Section II.B.

There is a case from Ohio that goes the other direction. *Lindsly v. Worley*, No. 1:09-CV-375, 2012 WL 12986674, at *2 n.1 (S.D. Ohio June 19, 2012). In *Lindsly*, the court found no *Garrity* protection when, although the officer was required to answer truthfully or face potential disciplinary action, no evidence showed he was required to waive his Fifth Amendment privilege against self-incrimination. Additionally, the court in *Camacho* found it relevant that provisions in the Miami City code, like the statute in *Garrity* itself, "specifically provide[d] for the dismissal of city employees who invoke their Fifth Amendment privilege against self incrimination." *United States v. Camacho*, 739 F. Supp. 1504, 1516 (S.D. Fla. 1990). The *Camacho* court opined these provisions were likely unconstitutional. *Id.* at 1516 n.11.

However, the bulk of cases (including cases in this Circuit) hold that *Garrity* immunity attaches when there is *coercion to speak*; its application does not depend on a penalty targeted specifically at invocation of the right to be silent.

The touchstone of *Garrity* protection, then, is compulsion to speak, not that the assignment of punishment is specifically tied to assertion of the constitutional right against self-incrimination.

As will be seen, in this case, the policies alleged to be coercive did not target the invocation of the right to remain silent. Rather, they required full cooperation with an investigation under threat of substantial discipline.

**F.**

Fifth, for a statement to be compelled under *Garrity*, it is not necessary that the interviewee subjectively experience the same pressure as the officers in *Garrity*. In other words, the interviewee does not have to prove he felt he had to make a terrible choice between losing his

16

job on one hand and opening himself to potential criminal prosecution on the other hand.  This is because the point of *Garrity* immunity is to dissolve this dilemma.  *See* D.E. 87 at 6-7.

There are cases that suggests otherwise.  For example, the *Indorato* court finishes its *Garrity* analysis by observing, "Defendant, here, was not, as in *Garrity*, put 'between the rock and the whirlpool,' [*Garrity*,] 385 U.S. at 498; he was standing safely on the bank of the stream." *United States v. Indorato*, 628 F.2d 711, 716-17 (1st Cir. 1980).  Also, the D.C. district court in *Cook* proposed, "To make out a *Garrity* claim, the officer must demonstrate that he had been put 'between the rock and the whirlpool,' *Garrity*, 385 U.S. at 498, by having to choose whether to incriminate himself or to lose his job." *United States v. Cook*, 526 F. Supp. 2d 1, 6-7 (D.D.C. 2007), *aff'd*, 330 F. App'x 1 (D.C. Cir. 2009).  The court found that "both the possibility of prosecution and the possibility of termination were far too tenuous to support a finding that he was between 'the rock and the whirlpool'" at the time he filed his reports.  *Id*. at 8.  To be clear, the actual legal test applied by the court in *Cook* was the two-part test of *Vangates* and *Friedrick*: "In this Circuit, an officer claiming the protection of *Garrity* 'must have in fact believed his . . . statements to be compelled on threat of loss of job and this belief must have been objectively reasonable.'" *Id*. at 7 (quoting *Friedrick*, 842 F.2d at 395).  And the *Cook* court applied this two-factor test.

As will be seen, in this case, Defendant testified he did not subjectively experience the same pressure as the officers in *Garrity*.  Rather, he testified he understood *Garrity* immunity, and therefore felt confident his RR-interview statements could never be used against him in a criminal proceeding.

**G.**

Sixth, it is important to note that *Garrity* immunity does not apply to "standard" or "routine" reporting required by one's job duties.  "Police officers have unsuccessfully attempted to exclude reports prepared in the normal course of their duties from criminal trials."  *United States v. Smith*, 821 F.3d 1293, 1303 (11th Cir. 2016) (quoting Robert Myers, *Code of Silence: Police Shootings and the Right to Remain Silent,* 26 Golden Gate U.L. Rev. 497, 525-26 (1996)).  Instead, *Garrity* immunity applies when the defendant was subject to an **administrative or criminal investigation**.

For example, the D.C. District Court in *Slough*, in finding that statements were *Garrity*-protected, first explained that the interviews that implicated *Garrity* "were anything but routine." *United States v. Slough*, 677 F. Supp. 2d 112, 138 (D.D.C. 2009), *vacated*, 641 F.3d 544 (D.C. Cir. 2011).[6]  The government in *Slough* argued that the interview statements "resulted from mundane, job-related reporting requirements, not unlike the obligation to report a missing or stolen weapon."  *Id*. at 137.  The Court agreed with this concept, but disagreed with its application in that case:

> Indeed, routine, contemporaneously-prepared incident reports are generally not considered compelled *Garrity* statements.  *See, e.g., United States v. Cook*, 526 F. Supp. 2d 1, 8-9 (D.D.C. 2007) (rejecting the defendant's *Garrity* challenge to a use-of-force report that he was ordered to prepare after an individual in his custody complained that the defendant had assaulted him), *aff'd* 330 F. App'x 1 (D.C. Cir. 2009); *see also Devine v. Goodstein*, 680 F.2d 243, 246-47 (D.C. Cir. 1982); *United States v. Ruiz*, 579 F.2d 670, 675-76 (1st Cir. 1978); *Watson v. County of Riverside*, 976 F. Supp. 951, 954-55 (C.D. Cal. 1997).

---

[6] The district-court decision in *Slough* was vacated on other grounds, but Defendant did not note this adverse subsequent history in his post-hearing brief, where he identified *Slough* as a case similar to his.  D.E. 85 at 7.

*Id*.  However, in *Slough*, the interviews were part of a State Department investigation into a shooting incident that left over thirty people injured or dead.  *Id*. at 138.  The investigation was both administrative and criminal in character; not routine.

> For another example, the D.C. District Court in *Cook* stated,

> *Garrity* does not stand for the proposition that a statement made in a standard report is coerced whenever an officer faces both the remote possibility of criminal prosecution if he files the report and the arguably even more speculative possibility of termination if he declines to do so.  Rather, the touchstone of the *Garrity* inquiry is whether the defendant's statements were coerced and therefore involuntary.

*Cook*, 526 F. Supp. 2d at 8.  The Eleventh Circuit in *Smith* quoted this language from *Cook* and explained that, in *Cook*, the statements "were not coerced within the meaning of *Garrity,* in part because the deputy was not under administrative or criminal investigation when the reports were requested."   *Smith*, 821 F.3d at 1303.   Indeed, the *Cook* court stated, "the presumption underlying *Garrity* and its progeny is that the subject employee is under investigation at the time the challenged statement is made."  *Cook*, 526 F. Supp. 2d. at 8.  *Garrity* immunity should not "be applied prior to the initiation of an administrative or criminal investigation."  *Id*. at 9.  And the  actuall record  was clear that the written reports at issue were "simply" collected and forwarded to evaluate "for determining whether to initiate a formal administrative or criminal investigation."  *Id*. at 3.

For this rule (that *Garrity* immunity does not attach to "routine" reports made by officers not under investigation) appears to be an application of the two-prong *Garrity* test.  In other words, courts have found that when the defendant's statement was part of his routine reporting requirements, then any fear of substantial job penalties for failure to cooperate was not subjectively held and/or was not objectively reasonable.   "Standard" or "routine" reporting

requirements (and "reports prepared in the normal course of [one's] duties") do not produce compelled or coerced statements.  However, as the courts in *Cook*, *Slough*, and *Smith* make clear, statements are more likely to be compelled when they are made as part of an "administrative" or "criminal" investigation.  *See Smith*, 821 F.3d at 1303; *Cook*, 526 F. Supp. 2d at 8-9.

As will be seen, in this case, Defendant was under an internal investigation in the form of an RR interview.  Although KSP RR investigations are not particularly rare, they are triggered by events such as a use of force that results in injury to the arrestee requiring medical attention. The challenged statements come not from "reports prepared in the normal course of [Defendant's] duties."  *Smith*, 821 F.3d at 1303.  An argument can be made that RR reports are "routine" in that they are not terribly uncommon and that they are automatically triggered by certain scenarios that often do not involve actual criminal activity or policy violations. Nevertheless, RRs are administrative investigations.  And the caselaw on this topic makes clear that administrative and criminal investigations both fall outside the ambit of "routine" reporting requirements.

In conclusion, the pivotal question is whether Defendant's RR statements were coerced under *Garrity* and *McKinley* in that Defendant (1) subjectively believed he would face a substantial penalty if he failed to answer the questions and (2) that belief was objectively reasonable.  The Court finds under the available facts that both elements are met here.

### III.  The Evidence

The Court now turns to summarizing the relevant evidence in this case.  The Court has evaluated all of the evidence presented.

20

## A.  Documents

### 1.  Affidavits

Defendant attached his own affidavit to his motion.   D.E. 55-9.   According to the affidavit, after the incident in which Hamblin was injured:

> I reported what KSP terms a "response to resistance" incident to my direct supervisor, Sergeant Jason Partin.
>
> 5.      At the time I contacted Sergeant Partin, I believed KSP policy required me to notify Partin and to provide details about the incident necessitating report.
>
> 6.      During the minutes, hours, and days that followed, Sergeant Partin gave me a series of directives and made several inquiries of me.  He instructed me to meet him at Baptist Health Corbin Hospital.  He directed me to pose for photographs he took of my hands, face, and clothing.  During at least three stages, (*i.e.,* my initial conversation with Sergeant Partin while I was still at the scene of the incident, my discussions with him at the hospital, and an interview on August 20, 2020, at KSP Post 11), he asked me detailed questions about the incident, the arrestee's injuries, and what I and other troopers saw, heard, and did between August 17 and 18, 2020, among many other questions.
>
> 7.      During every interaction I had with Sergeant Partin about this particular response to resistance, I answered his questions and followed his directives because I believed that I was required to answer and cooperate with his investigation.  It was my understanding and belief at the time that Kentucky State Police troopers were not permitted by policy and prevailing practices to refuse to answer questions of or follow instructions given by a superior officer in the course of a response to resistance investigation.  I believed then that such a refusal would result in me being deemed insubordinate and therefore terminated, demoted, or suspended.  I was specifically aware that KSP policy called for termination, demotion, or suspension of troopers who were insubordinate.
>
> 8.      Although I did not review the KSP Response to Resistance Policy immediately before any of my interactions with Sergeant Partin concerning the incident in question, I had reviewed that policy several times in the past.  I always understood and interpreted the policy to require me to not only report physical responses to resistance that resulted in injury to arrestees but to also cooperate completely with any ensuing KSP investigations.  Whether they involved me directly or as a witness, I always cooperated with and answered the questions of superiors conducting prior response to resistance investigations because I believed it was a requirement that I did so.  To my understanding, a Response to

Resistance investigation was a form of internal investigation for which I had no choice but to cooperate.

D.E. 55-9 at 2-4.[7]  At the evidentiary hearing, Defendant testified consistently with his affidavit. And every other witness agreed that Defendant was required by KSP policy to answer Partin's questions and cooperate with the investigation.  And every witness agreed that refusal would likely result in an investigation for insubordination or obstruction that could lead to termination, suspension, and other potential penalties.

Defendant's motion was also accompanied by the affidavit of former KSP Lieutenant Clyde Anthony Dingess.  D.E. 55-10.  He said:

> 7.      It is my understanding and belief that Kentucky State Police troopers are not permitted by policy and prevailing practices to refuse to answer questions of or follow instructions given by a superior officer in the course of a response to resistance investigation.

> 8.      It has always been my understanding and belief that statements made by troopers during a response to resistance investigation are subject to *Garrity* protections pursuant to Kentucky State Police policies and procedures.  I held that belief before, during, and after August 18, 2020, and I hold that belief today.

*Id*. at 2-3.  Lt. Dingess opined that had Defendant *not* answered Sgt. Partin's questions, he would have "ultimately been disciplined and an internal affairs investigation would have been opened for insubordination which would result in disciplinary actions."  *Id*. at 3.  Lt. Dingess testified consistently with his affidavit at the evidentiary hearing.  And Sgt. Partin gave similar testimony. Both agreed that, under the policies and culture of the KSP, Defendant would likely have faced serious discipline if he had refused to answer questions in the RR process.

## 2.  Policy Statements

The parties attached multiple exhibits to their filings.  A redacted version of Sgt. Partin's RR report is attached to both the motion (D.E. 55-11) and the response (D.E. 59-2).   An

---

[7] Page-number citations for items in the record are to the blue numbers generated by ECF.

unredacted version was admitted under seal at the hearing.  Both parties filed some of KSP's "General Orders," which are statements of administrative policy.  These include the AM-B-2, AM-B-3, AM-C-13, AM-E-1, AM-E-2, and OM-B-4a.  These General Orders were also admitted as exhibits at the hearing (including one not previously filed, the AM-E-3) and discussed with witnesses.

Several of the written policies were highlighted at the evidentiary hearing and in the briefing.

The **AM-B-3** describes the KSP's **"Commanding Officers Supervisors & Change of Command."**  D.E. 55-13.  It establishes that "Supervisory responsibility shall be accompanied by commensurate authority."  *Id.* at 3.  Sgt. Partin agreed that this policy statement gives him authority to "command" and "hand down orders to" troopers.  D.E. 83 at 37-38.

The **AM-E-1** describes the **"Agency Disciplinary System."**  D.E. 55-15.  It includes a description of "Forms of Disciplinary Action."  *Id.* at 11-12.  There are three classes of policy violations.  The disciplinary action for the most serious, Class A, violations "shall include dismissal, reduction in rank or pay, or suspension without pay for at least 21 working days."  *Id.* at 11.

The **AM-E-3** describes **"Standards of Conduct."**  D.E. 55-14.  Among other things, it lists various Class A violations.  One of these is "Insubordination," described as follows:

> Officers shall promptly obey any lawful orders of a superior officer, to include orders relayed from a superior officer by an officer of the same or lesser rank. Officers who are given an otherwise proper order, which is in conflict with a previous order, or with any rule or regulation, whether stated in this regulation or elsewhere, shall respectfully inform the superior officer issuing the order of the conflict.  If the superior officer issuing the order does not amend or retract the conflicting order, the order shall be promptly obeyed, with responsibility for the conflict to be on the officer issuing the order. Officers shall not obey orders,

23

which require them to commit any illegal act.   Insubordination is a Class A violation.

*Id*. at 4-5.  Another Class A violation is "Obstructing an Internal Investigation."  The definition states, in part:

> Upon order of . . . their commanding officer, officers must answer and answer truthfully to any questions specifically directed and narrowly-related to the scope of employment and operations of the agency which may be asked of them.  No officer shall refuse or knowingly fail or omit to answer fully and truthfully all questions specifically directed and narrowly related to the scope of employment and operations of the agency, which may be asked.

*Id*. at 5.

The **OM-B-4a** governs "**Response to Resistance:   Reporting, Investigation, and Review.**"  D.E. 55-8.   The OM-B-4a identifies several situations that trigger a mandatory Response to Resistance ("RR") report.  One of these, relevant here, is when a trooper's actions "result in, or are alleged to have resulted in[,] an injury requiring medical treatment."  *Id*. at 3. When such a situation occurs, "the involved officer shall notify a Chapter 16 supervisor who shall immediately respond to the incident and initiate a *Response to Resistance Report*."  *Id*.  In making this report, "The investigating supervisor shall interview the involved KSP officer(s). This interview shall be audio-recorded."  *Id*. at 6.  The "investigating supervisor" is required to provide his RR report to internal affairs within ten days of the incident.  *Id*.; D.E. 83 at 61, 63.

### 3.  Shawna Kincer Email

Attached to Defendant's pre-hearing reply brief is a December 2020 email from KSP's general counsel Shawna Kincer to the FBI case agent on this matter, Chris Hubbuch.  It says,

> I apologize but I was not considering the response to resistance investigation when I sent the last email.  Although [KSP internal affairs] has not started their investigation, the Officers were interviewed during the RR investigation and Garrity would apply to that part.  We will have to separate that section out on a separate thumb drive.

24

D.E. 61-2 at 2.  Kincer testified at the evidentiary hearing that she believed at the time of this email that the RR interview was *Garrity*-protected.  D.E. 83 at 121-22.

**4.  Other Documents**

Defendant's motion includes photographs and reports of the precipitating arson incident with Mr. Hamblin.  Defendant's motion is also accompanied by short transcript excerpts of unrelated investigatory interviews of Defendant, to demonstrate how the KSP provides *Garrity* warnings in some contexts.

The government's response includes the initial teletype report of the use-of-force incident, a *Garrity* "Admonition of Rights" form signed by Defendant in an unrelated earlier incident, and other KSP policy statements.

**B.  Hearing Testimony**

**1.  Sgt. Jason Partin**

The first defense witness at the March 15, 2023 evidentiary hearing was KSP Sgt. Jason Tilmon Partin.  Sgt. Partin was Defendant's immediate supervisor in August 2020, and he conducted the RR interview and drafted the RR report.  Partin has been with KSP since January 2009.  D.E. 83 at 10.  He has been a sergeant since September 2015.  *Id*. at 10-11.

Sgt. Partin explained that, under KSP policies, he must initiate a response-to-resistance investigation whenever one of his subordinate officers uses force that results in injury to the suspect that requires medical attention.  An RR is a form of administrative internal investigation inside KSP.  *Id*. at 12.  He has conducted "8 to 10 to 12" RRs so far in his career as a sergeant.  *Id*. at 14.  He explained that RR investigations are different from internal-affairs ("IA") investigations.  *Id*. at 12-13.  However, RR reports go to the internal affairs division, and the

internal affairs division often bases its own investigation on the initial RR reports and accompanying materials.   An RR investigation can be a building block upon which an IA investigation is based.   *Id*. at 45.   An IA investigation can look into potential crimes or potential policy violations.   *Id*. at 87.   Sgt. Partin said that RR reports can eventually lead to internal punishments and even criminal prosecutions in some cases.   *Id*. at 13.

Sgt. Partin testified that, under KSP policies, whenever an officer uses force that results in physical injury requiring medical attention, the officer is required to report it.   Then, the investigating supervisor must conduct an RR investigation.   The investigator must interview all troopers involved, and must, under the policies, record the interviews.   D.E. 83 at 25-28.   Sgt. Partin testified that if a trooper ever failed to report a qualifying use-of-force incident, he would expect that trooper to be disciplined.   *Id*. at 26-27.   Concerning RR investigations, he said no officer has ever refused to answer one of his questions.   *Id*. at 39-40, 58-59.   He testified the KSP has a militaristic chain-of-command and he has authority to give orders to troopers below him. *Id*. at 37-38.

As for the investigation at issue here, Sgt. Partin testified it was Defendant who reported the use of force over the radio.   D.E. 83 at 29, 33, 56.   Sgt. Partin told Defendant to meet him at the Corbin hospital.   This was in the early morning following the arrest.   There, Sgt. Partin asked Defendant questions about the arrest and Hamblin's injuries.   And he took photos.   *Id*. at 29-30. Sgt. Partin later told Defendant to meet him at Post 11 in London for a more formal interview. This interview occurred a couple of days later.   At the interview, Sgt. Partin had Defendant leave his phone and Apple watch in a different room.   Sgt. Partin said this was done to avoid interruptions and because Defendant did not need to record the interview himself.   *Id*. at 30-31. Sgt. Partin first conducted a group pre-interview with all the officers who were involved.   Then,

26

Sgt. Partin interviewed Defendant one-on-one in one of the interrogation rooms. *Id.* at 31-32. Sgt. Partin considered Defendant to be "confined" during this interview. He did not tell Defendant he was or was not free to leave. This interview, unlike the previous conversations, was audio recorded. *Id.* Defendant fully cooperated, and Sgt. Partin did not threaten him with any sanctions. Defendant expressed no concerns and did not hesitate to answer Partin's questions. *Id.* at 33-35, 66-67.

Sgt. Partin made some statements about whether the RR investigation was "administrative," "criminal," and/or "routine." He agreed that "a response to resistance investigation is sort of a form of administrative internal investigation inside KSP." D.E. 83 at 12. RRs and IA investigations are the two types of "internal investigations." *Id.* at 12-13. RRs can be "serious" in that they can lead to internal punishments and criminal investigations. But Sgt. Partin has never had an RR, aside from the one in this case, that led to internal punishment. *Id.* at 13.

On cross-examination by the government, Partin explained, "it was an administrative investigation." *Id.* at 67. He did not think Defendant would have "thought that it was a criminal investigation." Sgt. Partin agreed the RR investigation "wasn't a criminal investigation;" rather, "The RR is [an] administrative investigation." *Id.* Also on cross-examination, he was asked, "And it's, in fact, a matter of routine because there's certain things that just trigger it?" He answered, "Yes." *Id.*

> Q.     Okay. And so those, you would say, response to resistance investigations, again, are a matter of routine?
>
> A.     Yes.
>
> Q.     And they are not triggered by any misconduct? It's not a disciplinary hearing?

> A.     No, unless something comes from IA that is filtered down to the supervisor to investigate some kind of conduct.
>
> Q.     Okay.  But in terms of just the response to resistance that are triggered by any of this use of force that requires medical treatment, it's just par for the course?  This just happens?
>
> A.     Yes.

*Id.* at 68.  The questioning continued:

> Q.     Well, the response to resistance you said and you would agree that that's a matter of routine that happens –
>
> A.     Yes.
>
> Q.     -- when certain use of force happens?
>
> A.     Yes.
>
> Q.     Okay.  And then an internal affairs investigation, that's triggered by allegations of misconduct or violation of policy?
>
> A.     Yes.
>
> Q.     And those are two separate investigations?
>
> A.     Yes.
>
> Q.      And at the time you held Trooper Elliotte's interview, there were no disciplinary proceedings in place?
>
> A.     No[, there were no disciplinary proceedings against Elliotte at that time].

*Id.* at 71-72.

Sgt. Partin testified that, at the beginning of the investigation, Partin had no concerns about Defendant's use of force on Hamblin.  D.E. 83 at 84-85.  Sgt. Partin said that assessing the trooper's truthfulness is part of the interview, and Defendant appeared truthful during the interview.  However, after the RR interview, Partin heard an inadvertently recorded conversation from Trooper Howell's dashcam, which caused him to become concerned.  *Id.* at 85-87.  Sgt.

Partin testified that, as to Defendant in this matter, he determined at the end of the RR investigation that Defendant had violated KSP policies. *Id*. at 18.

Sgt. Partin had never heard of a KSP officer refusing to cooperate fully with an RR investigation. He said that if it did happen, he would consult with the legal department for advice on how to proceed. D.E. 83 at 39-40, 59-60, 77.

Sgt. Partin testified he is familiar with KSP policies. And he believes KSP policies required Defendant to fully answer all Partin's questions and fully cooperate with the RR investigation. Otherwise, he testified, Defendant could face discipline for insubordination or obstructing an internal investigation. He said these would be Class A violations that could lead to termination. Sgt. Partin read from the AM-E-1 policy statement, under which a "Class A violation shall include dismissal, reduction in rank or pay, or suspension without pay for at least 21 working days." D.E. 83 at 35, 39-44. He read paragraph 10 of page four of the AM-E-3, the KSP's "Standards of Conduct" policy, which states:

> Upon order of . . . their commanding officer, officers must answer and answer truthfully to any questions specifically directed and narrowly-related to the scope of employment and operations of the agency which may be asked of them. No officer shall refuse or knowingly fail or omit to answer fully and truthfully all questions specifically directed and narrowly related to the scope of employment and operations of the agency, which may be asked. Obstructing an internal investigation is a Class A violation.

*Id*. at 41. Sgt. Partin testified he believed this policy was applicable when he was questioning Defendant in the RR investigation. He was conducting an internal investigation (though not an "internal affairs" investigation). And he was asking questions related to Defendant's scope of employment and operations of the agency. *Id*. at 41-42. He believes the questions he asks his troopers come with an implied order to answer truthfully. *Id*. at 88.

Sgt. Partin testified he possesses some power to immediately discipline troopers under his command. He has never done it, but the policies give him the power of temporary summary suspension. He cannot on his own give out Class-A-violation discipline. D.E. 83 at 46-47.

Sgt. Partin testified that, when he conducted Defendant's RR investigation, back when he was a "road trooper," and even now, he has always believed that refusal to truthfully answer a superior officer's question would be insubordination. He had been subject to RRs himself, and never believed that refusal to answer was an option. D.E. 83 at 52-53. He said troopers are tested on these policies and procedures and there is a general culture in the KSP that troopers have to answer RR questions. Accordingly, he felt no need to warn or to direct Defendant to answer his questions. He had never ordered a trooper to answer him because the need had never arisen. *Id.* at 52-54.

## 2. General Counsel Shawna Kincer

Attorney Shawna Kincer has been general counsel at KSP for six years, and since 2020 she has also been the Police Commissioner's executive advisor. She is the top attorney at the agency and answers directly to the Commissioner. Part of her job is representing troopers and the KSP in court. She is also part of the disciplinary process for troopers. D.E. 83 at 98-100. She is involved in IA and RR investigations. As part of the "classification committee," she is also involved in classifying policy violations. Her job involves interpreting policies and giving advice on policy changes. *Id.* at 100-03. In her role, she supervises five other attorneys, a paralegal, and records custodians. *Id.* at 99.

Ms. Kincer's testimony on RR and IA investigations tracked with Sgt. Partin's. She agreed that RR investigations are serious. They can become the building blocks of later IA investigations, which can then result in internal punishments through internal affairs. D.E. 83 at

105-06.  Ms. Kincer testified that she signs off on all RR reports.  None of them moves forward without her signature.  She reviews them as to whether she agrees with the investigator as to whether KSP policies have been violated.  She has been involved in "hundreds and hundreds" of RRs.  *Id*. at 106-07.  She agreed that when there is a use of force that causes injuries requiring medical treatment, the trooper involved is obligated to report it.  Then the trooper's supervisor is obligated to conduct an RR investigation and conduct a recorded interview.  *Id*. at 111-13.

Ms. Kincer was shown a heavily redacted copy of Sgt. Partin's RR report in this matter.  She testified that she had provided this version of the report to FBI Special Agent Hubbuch.  Her staff redacted it because they believed certain statements were protected by *Garrity*.  They had redacted "twenty-something" pages from it.  *Id*. at 118-21, 158.  Ms. Kincer testified that SA Hubbuch may have obtained his unredacted version of Defendant's RR report due to an "error" by a lieutenant.:

Q. Are you aware that KSP Lieutenant Ira Napier from the earliest days of the FBI investigation was acting as a co-investigator?

A. Yes, I'm aware of that.

Q. So would you have ever allowed someone working that closely with the FBI to have an unredacted form of a report that you thought contained *Garrity* material?

A. No, not intentionally.

Q. Do you believe, if that report got out, it got out behind your back?

A. I just think it was an error.  I don't know.  I'm not going to point fingers.

Q. Do you know whether Lieutenant Napier shared that unredacted version with the FBI during that joint investigation?

A. I have no idea.

*Id*. at 157.

Ms. Kincer testified that she believed Defendant's RR statements were compelled under threat of substantial penalties and therefore warrant *Garrity* protection.

Like Sgt. Partin, Ms. Kincer believes that a superior officer's question comes with an implied order to answer the question truthfully.  D.E. 83 at 159.  Ms. Kincer testified that a trooper's obligation to answer a superior officer's questions is part of

> our history.  That's the way that we have always operated.  It is the culture.  It's [a] paramilitary organization.  We don't have an Officer's Bill of Rights.  We're not protected that [way].  And so we're under Chapter 16, not Chapter 15.  All we have is our integrity and our word; and so [a trooper is] expected to cooperate and to answer all questions.  Otherwise, you're subject to violation of our Standards of Conduct, potentially.  To me, that feels compelled.

*Id*. at 137.

Upon questioning about her email (reproduced above in Section III.A.3), Ms. Kincer testified:

Q.    Is it fair to say that on the date you wrote this email, December 23, 2020, you believed statements troopers made to investigating supervisors in connections with RNR[8] investigations were protected by *Garrity* principles?

A.    I did.

Q.    And is that because you thought at that time, in sum and substance, that KSP's RNR policies required troopers to answer investigating supervisor's questions?

A.    I think they -- yes.

Q.    As we talked about earlier, the whole purpose of the policy would essentially be defeated if it were otherwise and the troopers got to pick and choose when they answered, right?

A.    Correct.

Q.    Did you also think that KSP adhered to a militaristic chain of command?

---

[8] The transcripts often refer to response-to-resistance investigations and reports as RNRs.  Based on the written materials in the record, it appears the parties, witnesses, and lawyers often abbreviated "response to resistance" as "R&R."

A.      We are a paramilitary organization.

Q.      And as such, did that mandate troopers to answer questions from their superior officers conducting RNR investigations?

A.      Yes, I believe so.

Q.      And if they didn't answer, is it true that troopers might be punished for insubordination?

A.      You know, the situation's never happened.  So I don't know in reality how this process would play out, but I do believe that they are compelled to cooperate and be honest.

Q.      If you couldn't be certain about how it would play out as KSP's highest-ranking attorney, could you ever find fault in a trooper who had some uncertainty about that?

A.      Probably not. I mean, troopers are taught from the very beginning honesty is all you have and to be honest.  That's day one.

Q.      Is insubordination a Class A violation of KSP's standards?

A.      It is.

Q.      And if someone were actually pursued and found to have committed a Class A violation, is it true that they could be terminated, demoted, or suspended without pay for at least 21 days?

A.      That's correct.

D.E. 83 at 122-24.  Ms. Kincer further testified that failure to answer RR questions could be

obstruction, another Class A violation.  *Id*. at 124-25.

Ms. Kincer also testified:

Q.      Based upon your years of experience with KSP, do you believe there is a general culture in the KSP that embraces the idea that troopers have to answer higher-ranking officers about important matters like RNR investigations?

A.      I do.

33

Q.      And as long as you've been with KSP, are you aware of any time when KSP ever tried to use a trooper's RNR statements against the trooper in a criminal prosecution?

A.      I'm not aware.

Q.      Is that because the agency's practice has long been to treat those statements as *Garrity* protected?

A.      Probably.

. . . .

Q.      And in August of 2020, was that your understanding?

A.      Yes.

Q.      And that was indeed the agency's practice in August of 2020, to treat those RNR statements as *Garrity* protected?

A.      Correct.

Q.      Even though there may not be a *Garrity* warning affirmatively given?

A.      Correct.

*Id*. at 128-29.

Ms. Kincer testified she is not aware of any officer refusing to answer a question in an

RR investigation.

Q.      And have you ever known of a disciplinary proceeding resulting from an officer not answering a question during a response to resistance interview?

A.      It's never happened, to my knowledge.

Q.      And have you ever heard of an officer not answering a question in a response to resistance interview?

A.      I have not -- I have not.

D.E. 83 at 140-41.

Concerning KSP policies, Ms. Kincer testified:

34

Q.      It was official policy to compel officers, the troopers, against their Fifth Amendment right without giving them any notice that they had such a right?

A.      A Fifth Amendment right?

Q.      Yeah, that you are compelling them to answer.

A.      What I'm telling you is that, in KSP, every trooper feels obligated [to] cooperate and [would] feel compelled to cooperate with the investigation.

Q.      That's your opinion, correct?

A.      Right.  I thought you asked me my opinion.

Q.      But what I'm asking you is about official KSP policy.  Was KSP actually compelling these troopers at the time that Trooper Elliotte had this response to resistance interview such that they had to answer but you weren't going to give them any notice of that and then they could be subject to prosecution?

A.      The policy reads that the officer shall conduct interviews with KSP officers.  That's what it says.  It doesn't say the officer shall be compelled.  That's your argument to make, and I understand that.  But what I'm telling you is that -- if a supervisor comes to an officer, and I have to get a statement from you, as culture, whatever you want to call it, they feel compelled to cooperate.

Q.      But that does not mean that they are going to be subject to prosecution if they do not, correct?

A.      It depends.

Q.      Yeah. So there's no certainty that any discipline is going to come from an officer in [a] response to resistance interview if they refuse to answer a question?

A.      It's never happened. I don't know.

D.E. 83 at 145-46.

Ms. Kincer summarized:

All right.  So we have a chain of discipline, a chain of command.  We have gone over this before.  [Troopers] feel compelled to answer truthfully and honestly and cooperate.  They don't have a bill of rights.  [The RR policy may not be written] exactly that way, that the officers shall answer, but when [the RR policy says] the supervisor shall do this and they have to answer to a chain of command, [the troopers] feel compelled.

35

D.E. 83 at 148-49.

She said that if a trooper ever invoked the right to be silent under the Fifth Amendment in a RR or IA interview, most likely the interview would stop and the matter would be referred to her.  It would "potentially" result in discipline for a policy violation and they would "probably contact the local prosecutor and see what, if any, action they wanted to take."  D.E. 83 at 140-44.

Ms. Kincer testified that at one point, after this case was initiated, the KSP decided to give *Garrity* warnings at RR interviews.  They trained one class of sergeants to do this.  But then they discontinued doing this after a matter arose in Seattle where the DOJ asked a police department to stop giving *Garrity* warnings in use-of-force investigations.  D.E. 183 at 144-54.  She later clarified that (based on updated guidance from the DOJ since the investigation in this case) if a trooper pled the Fifth in an RR investigation, they would probably read the trooper *Garrity* and proceed to compel a statement.  *Id*. at 154.

The Court asked Ms. Kincer whether the RR investigation found Defendant to be dishonest.  She explained that the RR concluded the use of force was unjustified, but she did not recall it including a finding that Defendant had been dishonest.  D.E. 83 at 162-63.

The government's post-hearing memorandum states, "Kincer [testified] she now no longer asserts that the Defendant's RR statements were *Garrity*-compelled."  D.E. 86 at 14 n.4 (citing D.E. 83 at 140, 154).  However, Ms. Kincer did not actually repudiate her belief that Defendant's RR interview was *Garrity* protected.  As for the government's first citation from the hearing transcript, Ms. Kincer explained on cross-examination that she redacted the RR report to be on the "safe side." She explained:

> A:    Well, when [Agent Hubbuch] said, we don't want anything *Garrity* protected, on the safe side, I redacted that for him.  If . . .  you all later determine that's [not]

> *Garrity* [protected], you can have it.  I would rather not let the cat out of the bag before -- if I wasn't supposed to do that.  And that's what led to all this confusion, I think [an unredacted version of the RR report] went over to the DOJ [through another channel]. . . .  So I was just trying to cooperate and do the best I could.

> Q.   So were you really not sure whether or not those statements were *Garrity* protected, but because they involved the troopers that were being investigated, was it really you just thought it was better just to try to make a redaction of statements?

> A.   I thought it was *Garrity* protected.  Am I right in that?  I don't know that I am now.  But at the time, I did think it [was], if that makes sense.

D.E. 83 at 140.

As for the government's second citation, on cross-examination, Ms. Kincer attempted to further explain her belief that Defendant's RR interview was *Garrity* protected despite her decision not to have *Garrity* warnings given prior to RR interviews following the Seattle police matter:

> Q.   So you had testified that you believe there's a compulsion that *Garrity* applied when you were reviewing the response to resistance for Trooper Elliotte, that since you have done more research, had more thought, so as we sit here today, is it your belief that *Garrity* does not apply?

> A.   My belief is, under that case from Seattle, that from direction -- I think it was from the DOJ -- that, if *Garrity* is read in every single situation, it would take away the honesty part of it or the way it's treated, and it would become meaningless.  And so that if -- my belief now is, if they refuse to answer, then we would probably read them *Garrity* in that situation and compel them.

D.E. 83 at 154.  Ms. Kincer testified unambiguously she believed that Defendant's statements were *Garrity*-protected at the time she provided the RR report to the FBI.  She testified she currently lacks such certainty because of the dispute in this case.  But she also testified that if a trooper refused to answer questions in an RR interview, she would have *Garrity* warnings given and would compel a statement.  Thus, Ms. Kincer did not testify (as the government contends) that she currently believes Defendant's RR statements were not *Garrity* protected.

37

### 3.  Lt. Tony Dingess

The defense's third witness, Clyde Anthony Dingess, is retired from the KSP after over eighteen years of service.  He used to be "investigative Lieutenant" at the London post.  But now he is "chief deputy" of the Whitley County Sheriff's Office.  D.E. 83 at 166.  The Whitley County Sheriff is Defendant's father.  *Id*. at 175.

Lt. Dingess said he has known Defendant since Defendant was middle-school-age. Dingess worked with Defendant's father at KSP, and he thinks "a lot of" Defendant's family. D.E. 83 at 175.  In his current job he serves "at the pleasure" of Defendant's father, the Sheriff. *Id*. at 194.  He said that, though he respects Defendant's family, he would not perjure himself. *Id*. at 175-76.

Lt. Dingess explained that, in his former role at KSP, he was involved in thirty to fifty RR investigations—both as a trooper and a supervisor.  D.E. 83 at 168-69.  He said the purpose of an RR investigation "is to determine if there's been any kind of violation of Kentucky State Police policies and procedures, see if the response to resistance was justified, to gather all the facts and statements of the parties or witnesses."  *Id*. at 168.  RR investigations do not require a suspicion of misconduct.  *Id*. at 180.  Like the previous witnesses, Dingess testified that when a qualifying use-of-force incident occurs, the trooper must report it and the supervisor must interview and record every trooper involved in the incident.  *Id*. at 169.  RR and IA investigations are intertwined, as Internal Affairs assigns the RR case number, and then the RR report becomes a "resource document" for any IA investigation.  *Id*. at 195-96.  It is "absolutely" true that an RR report may become a building block of a later IA investigation.  *Id*.

Lt. Dingess agreed with the previous witnesses that troopers must answer questions in RR interviews.  "They have to answer."  D.E. 83 at 171.  It is a "common perception" among

38

troopers that they must answer their supervisors' questions; it is "ingrained from day one in the academy." *Id*. Lt. Dingess had never heard of a KSP trooper refusing to answer RR questions. *Id*. at 171, 201.  He said doing so would be insubordination and obstruction—Class A policy violations that could result in termination.  *Id*. at 172-73, 181-83, 194-95.  He said the answers are "compelled" in RR interviews in that "the trooper has to appear and participate."  *Id*. at 182.

Lt. Dingess said that anytime a superior officer questions a subordinate, the answer is compelled on an implied threat of an investigation for insubordination.  D.E. 83 at 181-83.  Lt. Dingess has never had to order a trooper to answer a question.  If a trooper refused to answer, Lt. Dingess believed that the trooper would face an IA investigation—it's a "common perception" in the KSP that a failure to answer would be the same as failure to follow a direct order and that an IA investigation would commence.  *Id*. at 200-01.

Lt. Dingess testified he and Sgt. Partin had discussed whether Defendant's RR statements were protected by *Garrity*, and they both thought they were.  D.E. 83 at 170.  Lt. Dingess has always believed RR statements were protected under *Garrity*.  He had never seen RR statements used in a criminal investigation.  *Id*. at 171.

Lt. Dingess explained that terminating a trooper for misconduct requires several steps, including the involvement of the legal department and the Commissioner.  D.E. 83 at 186-89.  But he said that, as a KSP supervisor, he could summarily suspend an officer in some circumstances.  *Id*. at 185-86.  And post commanders can at any time and for any reason take actions such as transfer of county assignment, changes to days off, and change of duties within the post district.  *Id*. at 198-99.

If a trooper had ever refused to answer one of his questions, Lt. Dingess would go up the chain of command for guidance.  D.E. 83 at 178-79.  If a trooper ever pleaded the Fifth, it would

"immediately" become an IA investigation.  *Id*. at 186.  Lt. Dingess also believed that any such insubordination would result in the post commander summarily transferring the Trooper:  "my belief is, if the troopers [in this case had] refused to answer those questions for Sergeant Partin, they would have immediately been transferred from the work assignment.  Days off, their schedules, all that is subject to change just at the whim of the [post] commander's discretion." *Id*. at 189-90.  In fact, Lt. Dingess "had conversations [with Defendant's post commander] about [moving him and his codefendants] as soon as this [incident] happened."  *Id*. at 190.  "[T]here were discussions about moving their work assignments.  And it's been historically known that a post commander can move anybody for any reason."  *Id*.  A transfer could mean the trooper will have to travel farther (without compensation) to the county of his assignment and he could lose any scheduled days off, among other consequences.  *Id*. at 198-99.

Lt. Dingess said no RR he has ever been involved in had resulted in a finding of misconduct, so he and Sgt. Partin were not expecting to find misconduct in this case.  D.E. 83 at 180-81.

Lt. Dingess was also asked (on cross-examination) about whether RR investigations are "routine."

Q:      RR policies are routine?  I mean RR investigations are routine, correct?

A.      I don't understand the question.

Q.      Is it common for there to be RNR investigations?

A.      It's mandated that you do RNR.  It's not common.  It's a requirement such as you get a criminal complaint or an investigation.  Any time you get those as a supervisor, you are required to do an investigation on them.

Q.      Sure.  And what triggers an RNR investigation is not a complaint, right?

A.      It is a reported use of force by the trooper.

40

Q.     Right.  And so, no matter what happens with that use of force, if there is a use of force up to a certain level, an RNR is mandated, correct?

A.     Yes.  It's assigned from internal affairs branch.

Q.     When you are conducting an RNR, there's not a requirement that any trooper be under investigation for misconduct, right?

A.     No.

Q.     In fact, since I'm sure . . . you agree, most of KSP's uses of force are justified, most of the time there are no misconduct findings as a result of an RNR investigation, right?

A.     I have found none.

Q.     In all the years, you have never found one?

A.     In RNRs, correct.

Q.     And so, therefore, you would agree many RNRs happen without any discipline ever occurring to the trooper, right?

A.     Yes.

D.E. 83 at 180-81.

On redirect, Lt. Dingess opined that RR investigations are not as routine as some other matters.

Q.     Mr. Dembo asked you about a series of what I'll call more mundane things that troopers have to do, like citations, time cards or reports or property forms.  And the questioning seemed to be asking you if those were in some ways the same as an RNR.  Do you believe those things are the same as an RNR investigation?

A.     No, sir, I don't.

Q.     How are they different, sir?

A.     Because those are mundane tasks that troopers do every day.  It's not something that would ultimately more than likely result in an internal affairs investigation if they did not complete those.

41

Q.     So based on your personal experience, as an administrator in the Kentucky State Police, is it your testimony that there's more gravity, more import to an RNR investigation and the questioning that goes with it than any of the things Mr. Dembo mentioned?

A.     Yes.

Q.     In fact, you would agree that sometimes RNR investigations snowball into criminal prosecutions, don't they?

A.     They can.

*Id*. at 196-98.

## 4. Defendant Jeremy Elliotte

Defendant entered the KSP academy in 2015.  D.E. 83 at 204.  There, he was instructed and tested on KSP policies, including the RR policy.  *Id*. at 205-06.  After working briefly at the Hazard post, he transferred to the London post, where this incident occurred in August 2020.  *Id*. at 204.  He has been "put off work" since October 2020.  *Id*. at 250.  Since August 2022, he has been on unpaid suspension.  *Id*. at 205.  Defendant said he also wrote a citation and arson supplement concerning the August 2020 incident, as required by policy.  *Id*. at 231, 237-38.

Defendant testified he has been subject to RR interviews twenty to 25 times.  D.E. 83 at 206.  He said he felt he had a good understanding of how they worked.  And he never believed that refusal to answer a question was an option—"absolutely not."  *Id*.  Like the other witnesses, he had never heard of a trooper refusing to answer a supervisor's question.  Not answering questions is "absolutely unheard of.  We all believe we were required to cooperate [with RRs]." *Id*. at 206-07.

Defendant had not previously been subject to an IA investigation.  D.E. 83 at 214.  When interviewed by internal affairs in this matter, he was given the *Garrity* warnings.  He had faced two CIRT (Critical Incident Response Team) investigations for discharging a firearm.  *Id*. at 216.

42

These investigations involve *Garrity* warnings.  CIRT tells you their investigation is criminal and cooperation is not compelled.  Defendant testified he understands he has the right to remain silent in a CIRT investigation because it is a criminal investigation that is designed to result in a grand jury case if the firearm discharge is not justified.   But he said RRs are internal administrative investigations, so full cooperation is required.  *Id*. at 215-17.

Defendant testified that, on August 18, 2020, he radioed dispatch to report the use-of-force incident to Sgt. Partin because he was required to do so.  D.E. 83 at 207-08.  While at the scene, he talked briefly to Partin over the radio or phone.  Sgt. Partin ordered Defendant to take Hamblin to the hospital and meet Partin there.  Throughout the interactions, Defendant answered all of Partin's questions.   *Id*. at 208-09.   Defendant believed not doing so would be insubordination, which could result in demotion, termination, or suspension without pay.  *Id*. at 209-10, 213.  Defendant also recalled meeting on August 20 with Partin and the other involved officers at Post 11.  *Id*. at 210-11.  After the group meeting, Sgt. Partin and Defendant did the one-on-one recorded RR interviews in a small interrogation room.   *Id*. at 211.   Partin told Defendant to leave behind his cellphone and Apple watch in his mailbox.  *Id*. at 212.  Partin recorded this 21-minute conversation.  *Id*. at 212, 239.  Defendant testified that every answer he gave Sgt. Partin was "100 percent truthful" and he made no attempt to mislead the investigation. *Id*. at 266-67.   Partin's questions were not very detailed, compared to those in the later IA interview, which lasted over two hours.  *Id*. at 266-70.

Defendant testified that, during the RR interview process, he did not feel free to refuse to answer questions.  He said he had been trained that doing so would be a Class A violation.  He said "KSP policy, the culture, the way I have been trained in the past" led him to believe there

would be "serious consequences" for failure to answer Partin's questions.  D.E. 83 at 213.  Partin never told him he had the option not to answer.  *Id*. at 213-14.

Defendant said that, based on his understanding of *Garrity*, he believed he had a duty to comply with administrative investigations, and believed that his statements as part of the RR could not be used against him criminally.  "It didn't even cross my mind [that my statements to Sgt. Partin could be used in court] because my training had told me that it couldn't happen and my experience had told me that that would be something that wouldn't happen."  D.E. 84 at 15.

Defendant testified he believes the KSP has the right to compel statements in administrative investigations.  The violation of his rights here, he said, is the use of his RR statements in a criminal prosecution.  D.E. 83 at 244.

Defendant testified he has believed his *Garrity* rights were violated since before he even met his defense attorneys.  D.E. 84 at 6.  He testified he became concerned about a potential *Garrity* violation at the meeting in October 2020 when he was suspended and learned that the matter was before a grand jury.  *Id*. at 6, 23-24.  He said that when SA Hubbuch served him with the indictment, he complained to Hubbuch that the prosecution was violating his *Garrity* rights. D.E. 83 at 264.

Defendant was also asked about RR investigations being "routine:"

Q.    Okay. And in the 20 to 25 previous response to resistance, nothing had happened even in IA, right?

A.    Not that I'm aware of, no, sir.

Q.    Okay. And so you didn't have any reason to think, based on your testimony, that you had done anything wrong that evening, correct?

A.    No.

44

Q.      And, therefore, your testimony is that this was what you thought was a routine administrative investigation at the time you were questioned by Sergeant Partin, correct?

A.      Yeah. It was -- it was just an administrative investigation, yes, sir.

D.E. 84 at 26.

## 5. Captain James Henry "Tray" Green III

The fifth and final witness, the only witness called by the government, was Captain Tray Green. At the time of the hearing, he had been commander of the KSP internal affairs branch for almost a year. D.E. 84 at 30. He was not involved in the investigation of Defendant. *Id*. For four years, Capt. Green was a Lieutenant with the Critical Incident Response Team ("CIRT"). CIRT gets involved whenever there is an officer-involved shooting or when someone dies in custody. CIRT investigations are "solely" criminal, and they occur prior to any "administrative" KSP investigation. *Id*. at 32-33.

Capt. Green had conducted few, if any, RR interviews himself. As a detective sergeant and CIRT member, he did only criminal, not administrative, investigations. Currently, he is rarely involved in RRs, as other members of the IA staff have more experience in administrative matters. D.E. 84 at 68-69.

Speaking as the internal affairs commander, Capt. Green testified that RR investigations are not "disciplinary." They are not based on allegations of misconduct. The purpose of the RR report is to determine whether an officer's use of force met policy guidelines. More often than not, there is no finding of misconduct. D.E. 84 at 34-35. When there is a finding of misconduct, then an IA investigation commences. IAs can also be triggered by a written complaint (such as a complaint from a citizen, a fellow trooper, or a post commander). *Id*. at 35-36. Few RRs ripen into IAs. And a small percentage IAs are based on RRs. *Id* at 39-40.

Capt. Green testified that, if a trooper refused to answer questions in an *IA* investigation, there would not be immediate discipline.  Instead, the refusal to answer would likely instigate a separate Class-A obstruction investigation.  D.E. 84 at 49.

Capt. Green testified that, although the written RR policy commands the supervisor to do a recorded interview, the policy does not contain a requirement that the trooper answer questions.  D.E. 84 at 36-37.  While the IA policy states that *Garrity* warnings should be given prior to an IA interview, the RR policy is silent on *Garrity* warnings.  *Id*. at 39.  When an RR report uncovers a policy violation, that RR report can set the stage for the subsequent IA investigation.  Internal Affairs may rely entirely on the evidence collected in the RR investigation, but they can also interview the troopers on their own.  Misconduct is often first unearthed in the RR process.  *Id*. at 61-63. And, if an IA investigation commences, the RR report is "intimately involved" in the IA review.  *Id*. at 62.

When an IA investigation results in a "substantiated" claim of misconduct, then the investigation is passed to the post commander.  From there, it goes to Capt. Green.  Then Capt. Green forwards it up for "command staff" review, where the Commissioner makes the final decision.  The Commissioner has "complete discretion" in imposing discipline.  D.E. 84 at 51-52.  A disciplined trooper can appeal to the "administrative review board" or the "trial board," depending on the classification of the violation(s).  Capt. Green said there is also the possibility in some cases to appeal a disciplinary action to the Franklin Circuit Court.  *Id*. at 54.

Capt. Green testified he has never heard of a trooper invoking his right to remain silent or otherwise refusing to answer questions in an RR interview.  D.E. 84 at 37, 73.  Were that to happen, Capt. Green guessed the supervisor would likely stop the interview and reach out to the legal department for guidance.  Such a refusal, he said, could prompt a disciplinary or criminal

46

investigation.  If the interview were to be continued after an invocation of the right to remain silent, the investigation would probably utilize *Garrity* warnings.  *Id*. at 37-39, 41, 49.

Capt. Green testified that a supervisor can summarily suspend a subordinate without pay. But this is not a "disciplinary" action, as only the Commissioner can meet out discipline.  D.E. 84 at 41.

Capt. Green testified he believes "initial" RR interviews are not *Garrity*-protected.  But if the investigation ripens into one where the trooper will be facing discipline, then *Garrity* warnings should be given.  Nevertheless, it is not unusual for IA investigations to rely solely on the evidence from an RR investigation, including those interviews.  But Capt. Green said that RR interviews should focus on the use of force, not misconduct.  He said that if a disciplinary issue arises in an RR investigation, that should result in a second interview with *Garrity* warnings. D.E. 84 at 62-65.

Capt. Green testified that, had he been in Defendant's position during the RR interview, he would have felt compelled to answer Partin's questions.  D.E. 84 at 71, 84-85.  He said that if his phone had been taken and he was being interviewed in an interrogation room, it would feel like a criminal interview to him.  He said he would feel "more compelled" to answer questions in an administrative investigation than a criminal investigation.  *Id*. at 71.  He was asked:

> Q:    [W]ould you agree with me that there exists in KSP and existed in August 2020 a culture built around the idea that troopers had to answer questions during RNRs?
>
> A.     I don't know that I would say a culture built around that, but I would think that's the general consensus of the agency that you are required to answer for when you use force.

*Id*. at 72.

Capt. Green testified he does not need to command officers to answer his questions because such an order is implied under KSP's chain-of-command policies.  D.E. 84 at 73-74.

Capt. Green initially testified that, other than this case, he was not aware of any RR answers being used in a criminal prosecution.  D.E. 84 at 73.  On redirect, Capt. Green recalled a case in 2022 or 2023 where the RR was part of a case referred for prosecution.  But the prosecutor declined to press charges in that matter.  Capt. Green did not participate in that matter—the referral was done by the operations division, not internal affairs.  In that matter, internal affairs conducted no interviews following the RR.  *Id*. at 89-97.  Capt. Green did not know if the RR materials given to the prosecutor in that matter had been redacted:

> A:      . . . .  If something was redacted when it was given to the prosecutor, I do not know.
>
> Q.      So is it fair to say you have literally little clue exactly what was given to the prosecutor?
>
> A.      Correct.

*Id*. at 97.[9]

Capt. Green discussed the temporary policy change that was also described by Ms. Kincer.  He said that, as a result of this case, the legal department instructed him to advise new sergeants to give *Garrity* warnings prior to RR interviews.  This new training took place in the "sergeant's academy," which is a one-week class.  The written policy had not changed, but that single sergeant's class was instructed to "read *Garrity*" for RRs.  Only the training changed (not the written policy), and only temporarily.  D.E. 84 at 74-77.

---

[9] The government's statement that "Captain Green testified that an RR investigation was provided to state prosecutors just within the last year" (D.E. 86 at 24) does not tell the whole story.  Capt. Green had no personal knowledge of that file and did not know whether the RR report had been redacted like the report supplied by Ms. Kincer in this case.

Capt. Green said this unwritten policy changed again after the Seattle matter.  The DOJ had issued a report addressing the fact that the Seattle police were using *Garrity* warnings in use-of-force investigations.  The DOJ encouraged them to stop and told the Seattle police that *Garrity* warnings created the appearance that they were trying to prevent criminal prosecutions of their officers.  D.E. 84 at 97.  Capt. Green continued:

> I had a conversation directly with . . . Attorney Eric Daigle [who] gives trainings to law enforcement across the U.S. . . .  He pointed out the Seattle thing to me.  And he told me that, if we go down the road of reading *Garrity* prior to our RR investigations, we will find ourselves likely facing problems with DOJ because they are going to say that we're intentionally trying to ever prevent our officers from facing criminal charges in these situations.

*Id*. at 98.

### C.  Observations

All the witnesses were generally credible.  All testified similarly about the applicable policies and the culture and expectations within the KSP.  All were knowledgeable about RR investigations and disciplinary actions within the KSP.  There are no classic issues of fact to resolve.  The Court's task is to ascertain the meaning of the evidence.

Defendant's credibility will be discussed more fully below.  As for Sgt. Partin, Ms. Kincer, and Lt. Dingess, at least the last two appear generally to be on Defendant's side.  Lt. Dingess is a close family friend who provided an affidavit helpful to Defendant's case.  And, because Ms. Kincer routinely represents KSP troopers in court to defend them in civil-rights cases, the Court presumes she has a general tendency toward protecting KSP officers in court.  Capt. Green testified for the prosecution, yet his testimony largely harmonized with that of the defense witnesses.

What set Capt. Green apart from the other witnesses was simply his opinion that RR interviews are not *Garrity* protected.  Of course, this is the legal question the Court is tasked with answering here.  Capt. Green's stated belief that RR interviews are not *Garrity*-protected does not square well with his testimony that, had he been in Defendant's shoes, he would have felt compelled to answer Sgt. Partin's questions.  D.E. 84 at 71, 84-85.  Capt. Green was also asked a series of questions about the awkwardness of his position that IA interviews are *Garrity* protected and RR interviews are not.  According to Capt. Green, RR interviews do not come with a suspicion of misconduct.  This appeared to be why he thought they were different on *Garrity* terms from IA interview.  Yet he also acknowledged that an IA investigation for misconduct (where he says *Garrity* should apply) may rely solely on evidence collected from the RR investigation (where he says *Garrity* should not apply)—thus creating situations where troopers are investigated for misconduct, but their statements were never *Garrity*-protected.  *Id*. at 63-64.

No witnesses disagreed as to the nature and procedures concerning internal KSP investigations and the expectation that troopers must answer truthfully all questions or face likely discipline.  The fact that all witnesses agreed on these material topics weighs in favor of finding they were all generally credible concerning the policies and culture of KSP.

## IV. Analysis

As previously explained, the test for *Garrity* protection is whether Defendant (1) subjectively believed he would face a substantial penalty if he failed to answer the questions and (2) that belief was objectively reasonable.  This appears to be the first *Garrity* case litigated in the Eastern District of Kentucky.  The Court emphasizes at the outset that this case draws on a unique and robust set of facts.  The Court and parties have been unable to locate any case quite like it, so the applicability of the findings here will necessarily be limited.  In other words, the

Court is not delineating boundaries for *Garrity* protection in hypothetical situations not presented.  The Court's decision is limited to the factual scenario presented.

To set the stage, the Court first briefly returns to matters discussed in Section II.A-H.  These principles were set forth to answer questions about the governing standard that arose in formulating this Recommended Disposition and to aid further pre-trial review as necessary.

### A.  Six Preliminary Observations

First, here the sanctions Defendant faced included possibilities less severe than job loss.  But, as discussed in Section II.B, this does not automatically bar the application of *Garrity*.  In this Circuit, *Garrity* can apply whenever "substantial penalties" are likely to result from refusal to answer questions.  Here, the penalties Defendant potentially faced for insubordination or obstruction include "dismissal, reduction in rank or pay, or suspension without pay for at least 21 working days."  D.E. 55-15 at 11.  The Court finds that these are substantial penalties.  And the government does not appear to contest this finding.

Second, here, unlike in *Garrity* itself, the threatened sanction was not explicitly communicated by the interviewer (Sgt. Partin) to the interviewee (Defendant).  But this also is not fatal to a *Garrity* claim, as the potential sanction can also be implied under existing statutes, policies, and procedures known to the interviewee.  In this case, all witnesses agreed that a refusal to answer questions during an RR interview *could* constitute insubordination or obstruction.  All agreed that the common understanding in the KSP of existing policies was that officers were required, nay compelled, to answer truthfully all questions in an RR interview.  The Court finds, given the KSP policies in evidence and the witnesses' discussions of these policies, that the existing policies and procedures, known to Defendant, in the context of the KSP's

militaristic culture, created an expectation that refusal to answer questions in an RR interview could lead to substantial penalties.

Third, the threatened sanctions here would not have applied automatically, immediately, or mandatorily.  The witnesses were in agreement that, had Defendant refused to answer questions, this would almost certainly have initiated a multi-step process for meting out discipline.  But the fact that various steps would be involved does not automatically mean that substantial penalties would not have been "likely" under the relevant legal standards.  Under the law discussed above in Section II.D, the Court finds that the non-automatic nature of the feared penalties does not, by itself, render *Garrity* protection inapplicable.

Fourth, in this case, the relevant policies concerning RR interviews and general chain-of-command principles do not explicitly target the invocation of the right to remain silent.  This case is different in this respect from *Garrity*.  But, as the law has evolved, the law recognizes that a requirement of full cooperation may be sufficient.  The Court finds that the policies that governed Defendant's RR investigation required him to fully cooperate with the investigation.  Existing policies allowed for compelled answers in RR investigations, and Defendant would have violated policies had he failed to answer Sgt. Partin's questions.  This is true even though the RR policy *itself* does not explicitly require the trooper to answer.  All witnesses agreed on this point.

Fifth, in this case, Defendant testified quite plainly and repeatedly he had no fear that his RR statements to Sgt. Partin could be used against him in a criminal prosecution.  As such, he did not subjectively feel the pressure of being "between the rock and the whirlpool."  But this is not a necessary element of a *Garrity* claim, as discussed above in Section II.F.  The *Garrity* immunity rule exists so that officers no longer need be placed in such an awkward position.  The

Court finds Defendant did not subjectively experience a horrifying choice about whether to answer Sgt. Partin's questions, but this fact does not by itself torpedo his *Garrity* claim.[10]

The Sixth point described above in Section II.G requires a bit more attention. As explained in Section II.G, *Garrity* immunity does not apply to "standard" or "routine" reporting required by one's job duties. The parties disagree as to whether an RR interview is a standard or routine part of a KSP officer's job. See D.E. 86 at 21; D.E. 87 at 9-10.

First, RR interviews are not rare events. Defendant testified he had been subject to as many as 20 to 25 prior RR investigations during his five years or so with the KSP. His supervisor Sgt. Partin had conducted between eight and twelve RR investigations in his five years as a sergeant. Ms. Kincer had reviewed hundreds and hundreds of RR reports during her six years as general counsel. And Lt. Dingess had been involved in 30 to 50 RR investigations over his eighteen-year tenure.

But finding that RR investigations are not rare is not the same as finding they are "routine" under the relevant law. As described in Section II.G, the meaningful distinction in the case law is between reports prepared in the normal course of one's duties on one hand and administrative or criminal investigations on the other. The Court here finds that RR investigations are administrative investigations and therefore not "routine" under these standards.

All witnesses testified consistently that RR investigations are a form of administrative investigation within the KSP. For example, Sgt. Partin explained why RR investigations occur:

> Typically, when anybody is injured, the suspect is injured, a full investigation is conducted. Usually the sergeant will respond to the incident and can start conducting an investigation. Sometimes it is directed by IA because you'll get

---

[10] This is contrary to the government's argument that Defendant's professed lack of fear "is fatal to his claim." D.E. 86 at 5, 17. Indeed, "Defendant admitted repeatedly that he was not concerned about self-incrimination when he spoke with Sergeant Partin." *Id.* at 5. But the emotions of subjective fear and concern are not elements of a *Garrity* claim.

this email or phone call saying: Hey, here's your response to resistance number; you need to conduct an investigation on this.  Or, based upon your knowledge, if the subject sustains injuries, then you kind of already know that it's going to result in a full investigation.

> . . . .

If the subject . . . needs medical treatment beyond first aid, then I take it upon myself to go ahead and start that investigation.

D.E. 83 at 11-12.  Sgt. Partin agreed that an RR investigation is a type of internal administrative investigation within the KSP.  *Id*. at 12-13, 83.  RRs can be serious matters in that they can eventually lead to internal discipline or criminal charges—both of which happened in this case. *Id*. at 13.  But he did not consider his RR investigation a criminal investigation—"the RR is [an] administrative investigation."  *Id*. at 67.

Ms. Kincer gave the following general description of RR investigations:

If an officer uses—certain types of force require a response to resistance, and that is where a sergeant will be called out to the scene to basically review, look, interview people, interview the troopers, interview the—the suspects, any other witnesses, take statements. And the ultimate goal is to determine whether it meets policy and procedure and it is a justified use of force.

D.E. 83 at 104-05.  She also agreed that RR investigations can be serious matters that can result in discipline or even criminal charges.  *Id*. at 105-06.

Lt. Dingess, who had performed 30 to 50 RR investigations, likewise explained:

My understanding of a response to resistance investigation is to determine if there's been any kind of violation of Kentucky State Police policies and procedures, see if the response to resistance was justified, to gather all the facts and statements of the parties or witnesses involved.

D.E. 83 at 168.  He also said RRs are a form of internal investigation.  *Id*. at 195.

Capt. Green also testified that an RR is an "administrative investigation" to determine whether a use of force "met policy guidelines" of "if there was anything that was not justified."

D.E. 84 at 33.  If a policy violation is found, then the matter becomes an IA investigation or an "administrative inquiry."  *Id*. at 35-36.

So, RR investigations are triggered by one of several specific use-of-force events, including, as here, when a use of force results in the arrestee needing medical attention.  The triggers for an RR investigation are well-defined and perhaps not uncommon.  But these triggering events are not "routine;" nor are the ensuing RR investigations routine in nature.[11]  All witnesses testified that the purpose of an RR investigation is to determine whether the officer(s) violated policy in their use of injury-causing force.  All witnesses testified that RR investigations can blossom into disciplinary proceedings and criminal prosecutions.  Ms. Kincer, Sgt. Partin, Lt. Dingess, and Capt. Green agreed that RR reports are sent to internal affairs.  And, when an RR report finds a policy violation, the report becomes an important part of the ensuing disciplinary proceedings.  In fact, subsequent disciplinary proceedings may rely entirely upon the evidence collected during the RR process.

RR investigations are therefore administrative or criminal investigations, and not mere routine, mundane, or standard aspects of a KSP officer's job duties.  They are different, for example, from writing citations and incident reports.  RR investigations specifically target the conduct of the officer under investigation.  And they can ripen into disciplinary and criminal proceedings.  Defendant was under investigation when he made his RR statements.  As such, his statements were not part of standard, routine reporting requirements.

---

[11] Sgt. Partin answered in the affirmative that RR investigations are "routine."  But in context he meant they are automatically triggered by certain events, and those triggering events are not necessarily misconduct.  D.E. 83 at 68. When Lt. Dingess was asked whether RRs are routine, he responded that he did not understand the question.  *Id*. at 180.  He said they are "not common," but they are "mandated" when triggered by a qualifying event.  *Id*.  As noted elsewhere, under case law, internal investigations are by definition not "routine."

### B.  Defendant's Subjective Belief

The question before the Court is whether Defendant "reasonably believed that substantial penalties were likely to result from his refusal to answer questions."  *McKinley v. City of Mansfield*, 404 F.3d 418, 436 n.20 (6th Cir. 2005).   An officer "claiming the protection of *Garrity* 'must have in fact believed his statements to be compelled on threat of [substantial penalties] and this belief must have been objectively reasonable.'"  *Id.* (quoting *United States v. Friedrick*, 842 F.2d 382, 395 (D.C. Cir. 1988)).   Under current law, "courts consider both the public employee's subjective belief and the objective reasonableness of that belief to determine whether the employee's statements were improperly coerced."  *United States v. Wells*, 55 F.4th 784, 797 (9th Cir. 2022).

> [F]or an employee to be coerced, he must both be objectively threatened with a substantial adverse employment consequence for refusing to incriminate himself and be subjectively aware of that penalty.  Although assessment of these objective and subjective elements will turn on the facts of each case, [both elements must be satisfied.]"

*Id.*

The Court here finds that, at the time of his RR interview, Defendant held a subjective belief that he would likely face substantial employment penalties for refusal to cooperate. Defendant testified quite clearly, consistent with his affidavit, that he believed at the time of his RR interview that the statements he made were *Garrity*-protected.  He testified consistently that he held this belief because he believed he was required by KSP policy to fully cooperate with the RR interview.  He testified he believed a failure to fully cooperate or failure to truthfully answer all questions would likely result in substantial penalties.  Specifically, he believed a refusal to answer would be a Class A violation in the form of insubordination or obstruction.  He credibly

testified to this belief and no evidence has been presented indicating a *lack* of subjective belief on Defendant's part.

The government appears to argue the Court should summarily reject Defendant's testimony because he stands here charged with crimes of dishonesty. *See* D.E. 86 at 6. Effectively, the government suggests Defendant's testimony on his subjective beliefs should be afforded zero weight unless that testimony is corroborated by other evidence. *Id*. at 6-9. The government insists that after-the-fact descriptions of his beliefs should be rejected unless some contemporaneous evidence supports the described belief. But no such bright line rule exists because the *McKinley* test requires consideration of all the circumstances.

Defendant is at this stage presumed innocent. The Court cannot afford zero weight to testimony under oath by a presumed-innocent individual. The Court thus finds the first element is met. When Defendant met with Sgt. Partin about the Hamblin incident, he subjectively believed a refusal to cooperate was likely result in substantial penalties.

The government also argues that Defendant's testimony concerning his subjective beliefs should be rejected because contradictions in his testimony indicate a lack of credibility. D.E. 86 at 9-13. First, the government points to testimony from the first day of the hearing where Defendant was unable to remember whether he told other people at KSP that he believed his RR statements were *Garrity*-protected. Indeed, on the second day, Defendant said that as early as October 2020 he told Lt. Dingess he was concerned that his *Garrity* rights might be violated by having his statements used in a criminal proceeding. *Id*. There was a meeting with other officials besides Dingess present on that day, but Defendant did not remember if he mentioned it to any of them. *Id*. at 11. The Court here makes no finding as to whether Defendant discussed his *Garrity* concerns with Lt. Dingess in October 2020, as the fact is of limited consequence.

57

And Defendant's change from not remembering such conversations to remembering a discussion vaguely with few details is insufficient to obliterate the credibility of his other testimony.[13] Granting that Defendant's memory and credibility are not perfect, the evidence as a whole preponderates in favor of finding that when he was interviewed by Sgt. Partin he believed that substantial penalties would likely result if he failed to cooperate.

### C.  Objective Reasonableness

Defendant's subjective belief (discussed above) was objectively reasonable under the totality of the circumstances.  As explored in Section III.A.2, under KSP policies, Defendant was subject to the orders of his superior officers.  In fact, failure to promptly obey a superior's lawful order qualifies as "insubordination."  The policy also provides, "Upon order of . . . their commanding officer, officers must answer and answer truthfully to any questions specifically directed and narrowly-related to the scope of employment and operations of the agency which may be asked of them."  Failure to do this constitutes "obstruction."  Defendant, Sgt. Partin, Ms. Kincer, Lt. Dingess, and even Capt. Green agreed that the questions of a superior officer (particularly during an internal investigation) carry with them an implied command that the trooper answer the questions truthfully.  D.E. 83 at 88, 159, 182-83; D.E. 84 at 73-74.

The policies also provide that insubordination and obstruction are Class A violations, which can result in "dismissal, reduction in rank or pay, or suspension without pay for at least 21 working days."  These are substantial penalties.  Now, the hearing testimony made clear that these substantial penalties cannot be levied immediately and automatically.  A trooper would

---

[13] The government argues that Lt. Dingess contradicted Defendant's testimony.  D.E. 86 at 12.  Defendant testified he told Dingess he was concerned a criminal prosecution would involve use if his statements in violation of *Garrity*. *Id.* at 10-11.  Lt. Dingess was asked whether Defendant ever claimed Sgt. Partin had forced him to answer a question against his right against self-incrimination.  *Id* at 12.  These are different questions, and the two witnesses' testimony does not contradict.  The defense's theory (consistent with the law) is that Sgt. Partin was fully within his rights to compel Defendant's statements, but the USA has no right to use those statements in this prosecution.

only be punished for insubordination or obstruction after several steps of inter-agency review. No KSP officer has ever refused to cooperate in an RR investigation.  However, were that to happen, the witnesses agreed that disciplinary procedures would be set in motion.

To be clear, the anticipated punishment must not be tenuous or speculative.  *United States v. Smith*, 821 F.3d 1293, 1303 (11th Cir. 2016); *United States v. Slough*, 677 F. Supp. 2d 112, 137–38 (D.D.C. 2009), *vacated on other grounds*, 641 F.3d 544 (D.C. Cir. 2011); *United States v. Cook*, 526 F. Supp. 2d 1, 8 (D.D.C. 2007), *aff'd*, 330 F. App'x 1 (D.C. Cir. 2009).  This is a close call.

On one hand, the potential punishments Defendant faced were speculative at the time of his RR interview in that no KSP trooper had ever refused to answer an RR question.  There has of yet been no test case.  Nobody can say for sure, "such-and-such is what would happen," because, although "hundreds and hundreds" of RR reports have been produced just in the last six years (D.E. 83 at 98, 107), no trooper has yet failed to cooperate.

However, based on the hearing testimony, the most likely explanation for this universal cooperation is that KSP troopers reasonably believe they will be substantially penalized for failure to cooperate.  This is what the policies essentially tell them.  As the witnesses agreed, KSP employees' belief in mandatory cooperation is part of the "culture," "character," and "consensus" throughout the KSP.

The fact that no trooper has refused to answer an RR question gives credence to the reasonable belief expressed by Defendant and the other witnesses that substantial penalties (following an administrative discipline process) would likely result in the event of failure to fully cooperate.  A few examples follow.

Sgt. Partin agreed with Defendant about the compulsion to truthfully answer questions in RR investigations:

> Q.     Based upon your experience in other RNR investigations, do you believe that the RNR policy required Jeremy to answer your questions?
>
> A.     Yes.
>
> Q.     Do you believe it required Jeremy to report the incident?
>
> A.     Yes.
>
> Q.     And to cooperate with you in all steps?
>
> A.     Yes.
>
> Q.     And did you also believe that KSP policies about insubordination required him to answer you?
>
> A.     Yes.
>
> Q.     Did you also believe that broader KSP policies concerning obstructing internal investigations required him to answer you?
>
> A.     Yes.

D.E. 83 at 35.  Sgt. Partin held the same beliefs when he was a trooper and subject to RR investigations.  *Id*. at 52-53.

Speaking in the *IA* context, Capt. Green testified that a failure to cooperate would not result in "immediate discipline."  However, "it would likely—I think it would be likely that it would be classified as obstructing an internal investigation, which is a Class A violation."  D.E. 84 at 49.  But also, speaking in the *RR* context, Capt. Green said that if a trooper refused to answer a question, the supervisor would "likely stop the interview and . . . probably speak to his lieutenant.  It would make its way up the chain and get direction from legal."  *Id*. at 37.  And then the issue might "very well" turn into a criminal investigation of the use of force in addition

60

to the administrative investigation. *Id*. at 37-38. He believed the likely next step in the internal investigation would be that the trooper would be given a *Garrity* warning and compelled to answer. *Id*. at 38. Taken together, Capt. Green's testimony indicates he believes a trooper's hypothetical refusal to answer questions in an internal investigation could result in Class A penalties.

Although Ms. Kincer also testified no trooper had ever refused to answer questions, she explained what could happen. If an officer invoked the Fifth, then "[w]e would probably contact the local prosecutor and see what, if any, action they wanted to take," presumably on the underlying use-of-force investigation. The IA investigation on the refusal to answer would probably "take a backseat to any potential criminal case." D.E. 83 at 142. A "disciplinary violation" would "potentially . . . come later;" the prosecutor would be consulted first. *Id* at 143. Because it had never happened, Ms. Kincer had "no certainty" about the ultimate result. *Id*. at 146.

Ms. Kincer was asked:

Q.    The policy at the time of Trooper Elliotte's response to resistance investigation -- even the policy now -- does not make it certain what would have happened if the officer refused to answer an RNR interview question?

A.    Yes and no, because then you would refer to the standards of conduct about [ob]structing an internal investigation and that that could be part of it. So I don't - - yes and no. I mean, not immediately.

D.E. 83 at 151. The Court interprets this response (in light of Ms. Kincer's entire testimony) as indicating that a refusal to answer would not result in certain and immediate punishment, but (giving first place to any criminal investigation) would be expected to result in disciplinary proceedings on a charge of obstruction.

Even though no KSP trooper has ever refused to answer questions or ever invoked the Fifth in an internal investigation, there is enough evidence on this record for the Court to conclude that the punishment for doing so is more than speculative.  The "likely" standard (as explained above in Section II.D) essentially means "more likely than not."  Significantly, no witness testified that a trooper's refusal to answer or cooperate would not result in substantial penalties or would even be unlikely to result in substantial penalties.[14]  Instead, all witnesses agreed that a refusal to answer would constitute insubordination and/or obstruction.  And all believed additional investigation would commence.  According to the testimony, the ultimate disciplinary authority resides with the Commissioner, who exercises complete discretion.  The Court has no evidence as to whether or how often the Commissioner declines to levy substantial penalties for a substantiated Class A violation.  But again, the fact that no officer has ever failed to cooperate adds weight to Defendant's subjectively and objectively reasonable belief that substantial penalties would likely result.

Here, the Court draws guidance from other cases where *Garrity* immunity was found to apply.  In *Graham*, the wildlife officers being investigated for mishandling hunting licenses were given a written warning before their interviews.  It told them "failure to answer truthfully 'may lead to disciplinary action up to and including termination.'"  *State v. Graham*, 2013-Ohio-2114, ¶ 25, 991 N.E.2d 1116, 1122.  The Ohio Supreme Court found that this notice was "dispositive" of the *Garrity* issue.  *Id*. ¶ 27.  Although the warning said "may," "the threat of discharge contained in the notice was sufficient proof that [the defendants] subjectively believed they could

---

[14] This is in contrast to, for example, *Hill*, where the lieutenant "testified that an employee who failed to answer a question because of concern about violation of his Constitutional rights would not be disciplined" and the lieutenant colonel "testified that if Defendant had not submitted to the FBI interview, the Sheriff's office would have taken no action."  *United States v. Hill*, No. 1:09-CR-199TWT, 2010 WL 234798, at *7 (N.D. Ga. Jan. 13, 2010).  No such testimony emerged in this case.

be fired for refusing to cooperate[.]  The threat also establishes that their belief was objectively reasonable, as it represented some demonstrable state coercion above the general directive to cooperate." *Id.*

In this case, there was no written notice.  However, Defendant, aware of existing policies in a manner consistent with all other witnesses, knew that failure to truthfully answer a superior officer's questions related to the scope of employment constitutes insubordination or obstruction, a Class-A violation.  KSP's policies signify that failure to answer truthfully may lead to disciplinary action up to and including termination.  If the punishment in *Graham* was not impermissibly speculative, then neither is the potential punishment here.

And, as previously noted in Section II.C, an "implied" warning emanating from existing policy statements is equivalent to a spoken or written warning.  *United States v. Goodpaster*, 65 F. Supp. 3d 1016, 1031 (D. Or. 2014) (quoting *Minnesota v. Murphy*, 465 U.S. 420, 437-38 (1984)); *id.* at 1029-30 (quoting *United States v. Saechao*, 418 F.3d 1073, 1076, 1077, 1079, 1080 n. 6 (9th Cir. 2005)); *People v. Haleas*, 937 N.E.2d 327, 332-33 (2010); *United States v. Trevino*, 215 F. App'x 319, 321 (5th Cir. 2007).

The government leans heavily on the fact that the RR policy itself (OM-B-4a) contains no directive that a trooper must answer truthfully all questions in an RR interview.  DE. 86 at 14. But the Court is under no compulsion to read the policies in isolation, and *McKinley* requires evaluation of all the circumstances.  *McKinley*, 404 F.3d at 436 n.20.  The parties testified consistently that the policies on insubordination and obstruction are believed to apply during RR interviews, meaning a trooper would face a Class A violation for failure to cooperate.

The government also highlights how the KSP's IA policy includes a directive that *Garrity* warnings be given, while the RR policy does not.  D.E. 86 at 14-15.  The Court has

considered this factor but does not find it dispositive.  Caselaw makes clear that *Garrity* immunity can attach even when warnings are not given.  The *McKinley* test requires more than just an examination of whether warnings were given.  The pivotal issue is whether there exists compulsion to tell the whole truth under threat of substantial job penalties.  Ms. Kincer, Sgt. Partin, Lt. Dingess, and Defendant all testified they believed RR statements were *Garrity* protected because such compulsion exists in RR interviews.  This compulsion results from the policies that superior officers have command authority, the belief that every question of a superior officer includes an implied command to answer truthfully, the policy on obstruction that requires truthful answers in internal investigations, and the culture and consensus within this paramilitary organization that failure to answer truthfully is not an option.  Even Capt. Green agreed that he would have felt compelled had he been in Defendant's shoes.  Although the RR policy is silent on *Garrity*, the evidence is sufficient for the Court to find that Defendant's belief that his statements were compelled was reasonable under the circumstances.

The government points to testimony wherein witnesses talked about other matters outside of RR, IA, and CIRT investigations being "compelled" or "required."  D.E. 86 at 16.  The Court recognizes this problem—that lay witnesses may have been using these terms differently from how the Court must employ them as legal terms of art.  Accordingly, the Court does not accept uncritically or in isolation the lay witnesses' statements about what they think is compelled, coerced, forced, or required.  This is no different from Capt. Green's conclusion that *Garrity* does not apply—such phrasing cannot displace the Court's analysis.

The question before the Court is whether, at the time of the RR interview, Defendant had a reasonable belief he was required to fully cooperate or face likely substantial penalties.  On this record, he did have such a belief and it was reasonable.  KSP polices, taken together and as

64

interpreted by the people who implemented those policies, established a reasonable expectation that failure to cooperate would likely result in Class A disciplinary proceedings.  Again, no witness testified this result would be foreclosed or unlikely.  Instead, given the wording of the policies and the witness testimony, such discipline appears likely except for the speculative possibility that the Commissioner could exercise his discretion and decline to impose a Class A penalty on a substantiated Class A violation.  The Court cannot simply draw this likely dispositive inference without an evidentiary basis.

The government argues Defendant is advocating for an unprecedented expansion of *Garrity* rights.  D.E. 86 at 21-25.  It is true that Defendant in his testimony made comments about various routine KSP tasks that he felt were required or compelled.  However, the Court here makes only the narrow finding that Defendant's RR interview was not "routine" as defined by case law and Defendant at that time possessed a reasonable belief that failure to cooperate was likely to result in substantial penalties.  The *McKinley* test may be the subject of the type of doomsday criticism the government offers, but the test and its contours must be faithfully followed by this Court.

### D.  Conclusion on *Garrity* Immunity

Accordingly, the Court finds that Defendant "reasonably believed that substantial penalties were likely to result from his refusal to answer questions."  *McKinley v. City of Mansfield*, 404 F.3d 418, 436 n.20 (6th Cir. 2005).  The evidence preponderates in favor of finding that Defendant "in fact believed his statements to be compelled on threat of [substantial penalties]" and that this belief was "objectively reasonable.'"  *Id.* (quoting *United States v. Friedrick*, 842 F.2d 382, 395 (D.C. Cir. 1988)).  Defendant's RR statements were coerced and compelled under *Garrity* and *McKinley*.  The statements are therefore subject to use immunity in

a criminal prosecution.  The statements to be suppressed are the ones given by Defendant to Sgt. Partin on and between August 18 and 20, 2020, beginning with Defendant's report of the incident, and including the subsequent recorded interview at Post 11.

## V.  Timeliness

When Defendant first filed his motion to suppress, the Court observed it was untimely and asked the government to state its position on the timeliness issue.  D.E. 56.  The government correctly observed that defensive motions were due by September 30, 2022, but the motion was not filed until January 13, 2023.  D.E. 59 at 11.  The government explained that it was not surprised by the motion:

> defense counsel for Mr. Elliotte had notified the United States as a professional courtesy several months ago that this issue was likely to be litigated, and both parties had extensive discussions regarding these issues.  Therefore, the United States was not prejudiced by the untimeliness of the motion and would not object to the Court considering the merits of the motion despite the late filing date.

*Id.*  Given the government's explanation, there appears no hint of procedural gamesmanship on the part of Defendant.  Both sides anticipated this motion would be filed if they were unable to resolve the *Garrity* issue on their own.  Particularly given the importance of the constitutional issue involved, the Court decided to excuse the untimely filing and proceed on the merits.

## VI.  Going Forward

Finding that Defendant's RR statements are protected by *Garrity* immunity does not resolve this matter.  When a prosecution is based to some degree on evidence shielded by immunity, then *Kastigar* comes into play.  *Kastigar v. United States*, 406 U.S. 441 (1972).  The question now becomes whether any of the evidence underlying the charges is untainted by the *Garrity* violation.  This inquiry will require an evidentiary hearing.

66

Additionally, there exists an exception to the *Garrity* rule that is relevant in this case. Even *Garrity*-protected statements may be used in an obstruction- or perjury-type prosecution. That is, a statement can be used at trial if the statement was false and its utterance constituted a crime.  Here, while Counts One and Two of the Superseding Indictment are substantive civil-rights offenses, Counts Three and Four target Defendant's RR statements as obstruction of justice.

> As the *McKinley* Court explained:
>
> [T]he general rule [is] that the Fifth Amendment permits the government to use compelled statements obtained during an investigation **if the use is limited to a prosecution for collateral crimes such as perjury or obstruction of justice**. *See United States v. Wong*, 431 U.S. 174, 178 (1977) ("The Fifth Amendment privilege does not condone perjury."); *see also United States v. Apfelbaum,* 445 U.S. 115, 131 (1980) (holding that "[n]either the [federal use] immunity statute nor the Fifth Amendment precludes the use of respondent's immunized testimony at a subsequent prosecution for making false statements"); *United States v. Mandujano,* 425 U.S. 564, 576 (1976) ("In this constitutional process of securing a witness' testimony, perjury simply has no place whatsoever."). . . .  As a matter of Fifth Amendment right, *Garrity* precludes use of public employees' compelled incriminating statements in a later prosecution for the conduct under investigation. *Garrity,* 385 U.S. at 500.  However, ***Garrity* does not preclude use of such statements in prosecutions for the independent crimes of obstructing the public employer's investigation or making false statements during it**.

*McKinley v. City of Mansfield*, 404 F.3d 418, 427 (6th Cir. 2005) (emphasis added).  Thus, even though Defendant's RR statements cannot be used against him in any trial on Counts One and Two, *Garrity* does not immunize their use as to Counts Three and Four—at least if these obstruction counts are prosecuted on their own (such as if Counts Three and Four are severed from the others or if Counts One and Two are dismissed).

## VII.  Conclusion

For the reasons discussed herein, the undersigned **RECOMMENDS** that Defendant Elliotte's Motion to Suppress (D.E. 55) be **GRANTED** to the extent it seeks a finding that

Defendant's RR statements warrant *Garrity* immunity.  Further proceedings are likely necessary if this recommendation is adopted.

The Court issues this Recommended Disposition pursuant to 28 U.S.C. § 636(b)(1)(B). The parties should consult that statute and Federal Rule of Criminal Procedure 59(b) concerning the right to appeal to the District Judge.  Any objection must be filed within **fourteen days** of the entry of this order.  Failure to object per Rule 59(b) waives a party's right to review.  Upon expiration of that fourteen-day period, this matter will be submitted to Judge Boom for her consideration.

This the 27th day of June, 2023.

Signed By:

*Hanly A. Ingram*

**United States Magistrate Judge**

68